## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY (CAMDEN)

| | | |
|---|---|---|
| DERRICK SMART, et al. | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | NO.  20-cv-12408-RAL |
| COUNTY OF GLOUCESTER, et al. | : | |
| Defendants. | : | |

**RICHARD A. LLORET**                                                        **July 11, 2023**
**U.S. Magistrate Judge**

### MEMORANDUM OPINION

Plaintiff Derrick Smart ("Smart" or "Plaintiff") has sued the County of Gloucester ("the County"), Eugene Caldwell ("Caldwell"), William Glaze ("Glaze") (collectively "the County Defendants"), Brad Schmidheiser ("Schmidheiser"), Michael McLaughlin ("McLaughlin") (Schmidheiser and McLaughlin collectively are "the Union Officials"), the Local Fraternal Order of Police #97 ("Local 97"), the New Jersey Fraternal Order of Police ("the State FOP") (Local 97 and the State FOP collectively are "the FOP Defendants"),[1] and John Does 1-5 in an eight-count complaint.[2] Doc. No. 29.[3] Defendants move for summary judgment.[4] I grant summary judgment in part and deny summary judgment in part.

---

[1] Local 97 filed a crossclaim against all other defendants for one count of contribution under the New Jersey Joint Tortfeasors Contribution Act and one count for indemnification. This crossclaim is not addressed at summary judgment.

[2] Count V alleged that the Union Officials retaliated under 42 U.S.C. § 1981. Doc. No. 29. Judge Rice dismissed the count. Doc. No. 37.

[3] All references to the electronically docketed record will be cited as "Doc. No. ___ at ___."

[4] The briefs before me are the Union Officials' Motion for Summary Judgment (Doc. No. 79), the County Defendants' Motion (Doc. No. 80), and the FOP Defendants' Motion (Doc. No. 89); Plaintiffs' Response to the County Defendants' and the Union Officials' Motion (Doc. No. 92); Plaintiffs' Response to the FOP Defendants' Motion (Doc. No. 95); the County Defendants' Reply (Doc. No. 96); the Union Officials' Reply (Doc. No. 97); the FOP Defendants' Reply (Doc. No. 99); and Plaintiff's Sur-Reply to the County Defendants (Doc. No. 101).

## FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

Derrick Smart is an African American man, who was employed as a correctional

officer ("C/O") with the Gloucester County Sheriff's Office beginning in 2004. Doc. No.

29, Plaintiff's Third Amended Complaint ("TAC"), ¶ 1. Below are the undisputed facts.[5]

### 1.    *Smart As an Employee of Gloucester County*

Smart both reported and assisted in reporting alleged race- or sex-based

misconduct between 2008 and 2011. In April 2008, Smart and Dominic Capanna

("Capanna") asserted that Warden Balicki ("Balicki") engaged in inappropriate relations

with female C/Os. *Id.* at ¶ 22. In October 2008, Plaintiff and Capanna initiated a "vote of

no-confidence" against Balicki, seeking union membership removal due to the

inappropriate conduct reported in April. *Id.* at ¶ 23. In October 2008, Smart and

Capanna also asserted certain A-Shift officers, supervised by then-Sergeant Caldwell,[6]

often assaulted inmates who were "typically African-American and/or Hispanic." *Id.* at

¶¶ 24-25. In October 2010, Smart assisted Malessia Lacey, a female C/O, in filing a

complaint with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶¶ 35-

36. In June 2011, Smart and Capanna filed an internal affairs ("IA") complaint alleging

that Defendant Caldwell engaged in inappropriate sexual relations with female inmates.

---

[5] These facts are derived from reviewing the parties' various statements of material facts. *See* Doc. Nos. 79, 80, 92, 96, 97. I have cross-referenced each document to confirm that the parties have agreed upon these facts. If any of the facts were admitted in part and denied in part, then I have omitted the portion which was denied. If any proposed facts were denied by an opposing party, then I have omitted the fact outright from this section.

[6] Defendant Eugene Caldwell, II, during the relevant time, was a corrections officer of Gloucester County and held the positions of Sergeant, Lieutenant, and Deputy Warden before he was promoted to Warden in 2013. *See* TAC at ¶ 5; Caldwell Dep. at 9:3-22.

*Id.* at ¶¶ 38-41. In November 2011, Smart and Capanna provided a written complaint to the Gloucester County Prosecutor's Office reasserting the complaint. *Id.* at ¶ 41.

In July 2011, Lieutenant Owens, an African American C/O, disciplined Smart for not wearing appropriate protective clothing while in a certain location of the jail. Derek Smart Deposition ("Smart Dep."), at 113:7-121:20[7]; *see also* Verbal Warnings, at 5.[8] Between March and July 2013, Plaintiff voiced "opposition to the Jail's closure." TAC at ¶¶ 47-49. However, the jail closed in July 2013. TAC at ¶¶ 6-7; Chad Bruner Deposition ("Bruner Dep."),[9] at 13:11-12. On January 7, 2014, Smart was twenty minutes late for a training and written up. Verbal Warnings, at 2.

### 2. *Local 97 Treasurer Transition from Smart to McLaughlin*

Between January 2008 and December 2011, Smart was the Treasurer of Local 97. As Treasurer, Smart was to make entries in a book of records. Smart Dep. at 320:6-12. The book of records was to contain a list of entries, a receipt book, a monthly investments statement, and a checkbook. *Id.* at 317:1-20. In 2009, Plaintiff hired Ron Ford ("Ford") to complete Local 97's accountings, which involved Smart providing Ford original receipts and documents. *Id.* at 320:1-20.

Plaintiff was elected Local 97's President in January 2012, but formally stepped down in February 2012. TAC at ¶ 42. McLaughlin was elected Treasurer in January 2012. Michael McLaughlin Deposition ("McLaughlin Dep."),[10] at 65:6-14. McLaughlin was an A-Shift C/O. TAC at ¶¶ 6-7. As the new Treasurer, McLaughlin requested all documents and reports for review; Smart provided documents he possessed, but Ford

---

[7] The whole deposition was filed as County Defendants' Exhibit 2. Doc. Nos. 80-4, at 24-74; 80-5.
[8] The whole document was filed as County Defendants' Exhibit 8. Doc. No. 81-1, at 1-11.
[9] The whole deposition was filed as County Defendants' Exhibit 4. Doc. No. 80-6, at 42-66.
[10] The whole deposition was filed as County Defendants' Exhibit 10. Doc. No. 81-1, at 32-67.

had additional documents. Smart Dep. at 324:1-325:6; 334:2-335:23. Plaintiff stated he requested the documents back from Ford between January and March 2012, but Ford refused to hand them over until he was paid for his services. *Id*. at 326:2-327:12.

In January 2012, McLaughlin informed Schmidheiser, Local 97's sitting President, of concerns McLaughlin had regarding the record keeping and account of expenditures during Smart's tenure as Treasurer. Brad Schmidheiser Deposition ("Schmidheiser Dep."),[11] at 56:24-60:23. Schmidheiser was another A-Shift C/O. TAC at ¶¶ 6-7. On February 7, 2012, McLaughlin sent Smart a letter stating his concern regarding "numerous transactions that were not lodged on our General account over the past [four] years." February 7, 2012 letter from McLaughlin to Smart ("2/7/12 McLaughlin Letter"),[12] at 1; *see also* Smart Dep. at 336:24-337:17. McLaughlin was seeking "clarification as to why these transactions were never posted in the Book of Records and to get the General Accounts balance verified, thru [sic] an Independent Auditor." 2/7/12 McLaughlin Letter, at 1. The letter stated that Mclaughlin found 345 transactions against Local 97's bank account omitted from the record book. *See id*. Ultimately, in early 2012, the State FOP initiated an internal forensic audit of Local 97's financial records to be performed by PP&D Accounting Services, Inc. ("PP&D"). Schmidheiser Dep. at 62:3-8, 84:20-22.

In November 2012, a majority of Local 97's members voted to expel Smart. Defendant Schmidheiser, in the capacity as President of Local 97, based expulsion charges on: "1) That Brother Smart violated the Oath and Obligation he took as a FOP member[;] 2) There was a show of Insubordination as per Our Bylaws and Oath and

---

[11] This portion of the deposition was filed as County Defendants' Exhibit 5. Doc. No. 81, at 1-56.
[12] This letter was filed as County Defendants' Exhibit 11. Doc. No. 81-2, at 1-16.

Obligation[; and] 3) He has hindered the effective running of Lodge 97." Tribunal charges.[13] Smart was not present for this vote. Smart Dep. at 179:5-13. Upon Smart's appeal, the State FOP overturned the vote and reinstated Smart, finding Smart did not receive due process. McLaughlin Dep. at 110:12-16.

### 3. Smart's Prosecution for Misappropriation of Union Funds

In November 2012, Schmidheiser emailed George Kline ("Kline"), the State FOP Treasurer, inquiring "[i]f for any reason it is determined there are grounds for criminal charges or an investigation, who would initiate that, the State Lodge, Lodge 97, or will this be a joint venture." November 23, 2012 Kline-Schmidheiser Emails ("11/23/12 Kline-Schmidheiser Emails"),[14] at 3; see also George Kline Deposition ("Kline Dep."),[15] at 37:6-21. Kline responded that "[c]riminal complaints are to be filed by Lodge 97." 11/23/12 Kline-Schmidheiser Emails, at 5.

Schmidheiser "out of a courtesy" went to Warden Caldwell to provide a "heads up" that he would be "tak[ing] something to the Prosecutor's Office regarding [Local] 97", because the jail had recently received negative press for an unrelated C/O's arrest. Schmidheiser Dep. at 177:2-16. During this conversation, Caldwell offered to reach out to the Prosecutor's Office to check which department Schmidheiser should contact. Id. at 177:16-22. Through Caldwell's communications, Anthony Garbarino ("Garbarino"), a Detective in the Prosecutor's Office's Major Crimes Unit, contacted Schmidheiser to schedule a meeting; Garbarino also let Caldwell know that he was arranging the meeting. Anthony Garbarino Deposition ("Garbarino Dep."),[16] at 7:7-10; 19:8-9; 20:9-

---

[13] This document was filed as the Union Officials' Exhibit L. Doc. No. 79-5, at 12.
[14] These emails were filed as County Defendants' Exhibit 14. Doc. No. 81-2, at 46-51.
[15] This portion of the deposition was filed as County Defendants' Exhibit 12. Doc. No. 81-2, at 17-29.
[16] This portion of the deposition was filed as County Defendants' Exhibit 17. Doc. No. 81-2, at 69-90.

21:5; Gloucester County Prosecutor's Office Investigation Report ("GCPO Investigation Report"),[17] at 1. On September 10, 2013, Garbarino interviewed Schmidheiser and another C/O; on September 19, 2013, Garbarino interviewed McLaughlin; and on March 11, 2014, Garbarino met with Schmidheiser again. GCPO Investigation Report, at 13-16.

After further investigation, Smart was arrested on August 22, 2014. GCPO Investigation Report, at 25; Complaint-Warrant.[18] The arrest occurred at the Gloucester County Jail, while Smart was working, when Defendant Glaze approached Smart, requested his work-issued firearm, and then escorted him to a room where Detective Garbarino and the detective's supervisor were waiting. Smart Dep. at 168:21-171:5; GCPO Investigation Report, at 25. Smart was then escorted to the Prosecutors Office, where he was formally processed and then released. Smart Dep. at 171:6-10; GCPO Investigation Report, at 25.

The charges resulted in acquittal on October 4, 2018.

4.  *Smart's Contract with the FOP Defendants Regarding Legal Representation*

Members of the State FOP and Local 97 are covered by two separate by-law provisions. *See* Doc. Nos. 94-1 ("State FOP By-Laws"); 94-4 ("Local 97 By-Laws"). Both by-laws have provisions regarding attorney representation and what requirements shall be met prior to the representation being assigned. Local 97's by-laws contain seven sections; the relevant portions are as follows:

Section 1. Any active member in good standing who shall as a result of the proper performance of his law enforcement duties
    A. Be threatened with arrest or who is actually arrested or sued.
    B. Be directed or summoned to appear before any legislative or government committee or body, or grand jury, or court of record for a magistrate

---

[17] The Report was filed as the Union Officials' Exhibit M. Doc. No. 79-5, at 14-39.
[18] The Arrest Warrant was filed as the Union Officials' Exhibit O. Doc. No. 79-5, at 44-46.

or police board of investigation, or investigative board having disciplinary powers.

       C. Or any member who shall believe that he is being or about to be deprived of his legal rights in relation to job tenure, wages, pensions or other benefits or privileges occurring to him as a result of his employment, provided such deprivation shall jeopardize the welfare of all, shall be entitled to apply to the lodge for legal assistance.

       Section 2. All applications for legal assistance shall appear in person before the board of directors. The board of directors may request written verification for legal aid. In the event the board of directors denies the application for legal aid, the applicant shall have the right to appeal to the general membership.

       Section 3. No member shall allege, indicate or promise that the lodge will assume payment nor shall the lodge pay or promise to pay for any legal services, unless specifically and directly authorized by it in writing, before the said services are rendered.

       Section 4. All cases in which legal assistance is granted shall be immediately referred to the lodge counselor.

       . . .

       Section 6. No appeal from any verdict shall be considered by the lodge, without the testimony of the case first being obtained for review by the board of directors. Should any member refuse to consider an appeal from a verdict against him when justifiable, the lodge shall be deemed to have fulfilled its obligation to said member and shall not be obligated to any further action.

Local 97 By-Laws, at 19-20.

       State FOP's by-laws describe the following regarding legal aid, in relevant part:

Section 1. Any local lodge within the scope of the New Jersey State Lodge may appeal to the Board of Directors of the State Lodge, in writing, for legal aid or financial assistance for the following reasons:

       A. Any member, in good standing, who may become involved and charged with any offense, while in the proper performance of his or her duties.

       B. To protect the tenure and civil service rights for the positions and promotions, for any member or members in good standing.

       C. To protect the right to organize under the Constitution of the State of New Jersey.

       D. Any other reason that is deemed appropriate to the expansion of New Jersey State Lodge or for the retention of its membership.

Section 2. Requesting and granting legal aid and requirements governing same.

A. All requests for legal assistance to the State Lodge must be made, in writing, signed by the local lodge President and Secretary and must contain the following information:

1. If for the lodge, the basis for request and nature of litigation.

2. If for a member, a copy of the charges or complaint against him.

3. A report as to what steps have been made or taken by the member and the lodge to date. Including any financial assistance given to the member by the members' lodge, or any other source.

4. If an attorney has been involved, a copy of all communication and a report on legal expenses paid to date or owed.

. . .

D. No local lodge or individual State Officer shall oblige the State Lodge for legal assistance without the approval of the State Board of Directors, except when it is in the best interest of the local lodge or member that the action be taken immediately and a commitment be given to an attorney before he will act.

1. The Investigation Committee shall not oblige the State Lodge for more than one thousand dollars ($1,000.00).

2. The State Board may increase this commitment at a regular or special meeting.

. . .

Section 5. The New Jersey State Lodge and any local lodge within its scope, shall not be obligated to furnish legal defense to any member or members, for an offense outside his or her police duties, or for a civil action against a brother member, whether or not said action results from the proper performance of his or her police duties.

State FOP By-Laws, at 31-33.

In addition to their by-laws, the State FOP also has a legal defense agreement. Doc. No. 94-10 ("Defense Agreement"). This agreement provides the respective law office that will serve as counsel of record and defines that covered incidents are incidents which are "duty-related." *Id*. at 1-2. The Agreement defines duty-related as "actions of the individual while performing his or her duties as a law enforcement

officer." *Id.* at 2. The agreement is explicit that coverage does not include "[a]ny actual or alleged act or omission that is NON DUTY-RELATED"; the agreement also makes clear that if the individual goes outside of the plan, then they are liable for all expenses incurred. *Id.* (emphasis in original).

### 5.    *Smart's Employment Status During and After Prosecution*

Shortly after his arrest, Smart received a letter written by Caldwell indefinitely suspending his employment due to the open prosecution. Smart Dep. 170:9-21. On August 25, 2014, County Human Resources confirmed Smart's employment was suspended without pay due to the criminal charges. August 25, 2014 Letter from Joann Schneider, County Human Resources, and attached Preliminary Notice of Disciplinary Action ("8/25/14 Disciplinary Package"), at 1. This decision was pursuant to a policy that "any time a prosecutor charges an employee[, the County] would do a suspension without pay pending the outcome . . .." Bruner Dep. at 30:21-25, 31:8-19.

On October 17, 2018, after the criminal charges were formally dismissed, Smart received a letter explaining his suspension without pay was retroactively converted to an administrative suspension with pay and that an administrative internal affairs investigation ("IA investigation") would be completed prior to formal employment reinstatement. *See* Doc. No. 92-6, Smart's Exhibit T ("10/17/18 Knestaut Letter to Smart"), at 66-67. Once an employee's criminal charges are found to be unfounded or dropped, the employee is reinstated and backpay is provided. Bruner Dep. at 36:25-37:4.

On March 20th, 2019, Smart was notified via letter that the IA investigation was closed and he should report to work the next day, March 21st. Doc. No. 79-5, Exhibit V

("3/20/19 Smart Email to Johnson").[19] On March 20th, 2019, Smart alerted Undersheriff Knestaut ("Knestaut") that he had filed a workers compensation claim due to the trauma of the experience and he would be unable to work for the foreseeable future. 3/20/19 Smart Email to Johnson, at 1; Smart Dep. at 218:20-24.

Smart was placed on sick leave on March 25, 2019; Smart used accrued sick pay and vacation days while on leave. *See* Doc. No. 82-1, Exhibit 36. After all vacation and sick days were exhausted, Smart applied to the Police and Firemen's Retirement System of New Jersey on August 18, 2020 for accidental disability retirement benefits. Doc. No. 79-5, at 76-77. Smart's retirement was approved on September 1, 2020, and his employment status terminated as retired. *See id*.

### B.  Procedural History

When reviewing Defendants' most recent Motion to Dismiss, Judge Rice provided the following procedural history:

> On August 19, 2016, Smart filed a complaint in New Jersey state court against the County, Caldwell, Schmidheiser, McLaughlin, Glaze, the Local Union, the County Prosecutor's Office, and five John Does, alleging, under state law, harassment/hostile work environment based on his race, retaliation, conspiracy, breach of contract, and intentional infliction of emotional distress. See Schmidheiser Mot. to Dismiss, Ex. 1, 8/19/2016 Compl. On December 16, 2016, the state court dismissed with prejudice all of Smart's claims except for his claim of retaliation. See id., Ex. 3, 12/16/2016 Order. The court later stayed the case pending disposition of the criminal charges against Smart and then entered a series of scheduling orders postponing the case deadlines. See Reply (doc. 21), Ex. A, 6/18/2018 Order, Ex. B, 7/17/2019 Order; Schmidheiser Mot. to Dismiss, Ex. 4, 12/2/2019 Order.

> On November 22, 2019, Smart filed an Amended Complaint, asserting state and federal claims of retaliation, discrimination, conspiracy, malicious prosecution, and breach of contract. See Schmidheiser Motion to Dismiss, Ex. 5, First Am. Compl. On December 19, 2019, Defendants filed a notice of removal.

---

[19] This email was filed as the Union Officials' Exhibit V. Doc. No. 79-5, at 73-75.

See <u>Smart v. County of Gloucester, et al.</u>, No. 19-21622, Notice of Removal (doc. 1). On July 14, 2020, I remanded the case to the New Jersey state court because Smart never obtained leave to amend his complaint. <u>See id.</u>, 7/14/2020 Order (doc. 40).

On August 11, 2020, the New Jersey state court granted Smart leave to file his Second Amended Complaint, which Smart filed the next day. <u>See</u> Schmidheiser Mot. to Dismiss, Ex. 9, 8/11/2020 Order; Smart's Resp. (doc. 17) at 2. In September 2020, Defendants again removed the case to this Court and moved to dismiss. <u>See</u> Notice of Removal (doc. 1).

Doc. No. 26, at 7-8.

Judge Rice dismissed this Second Amended Complaint without prejudice and allowed Smart to refile a Third Amended Complaint. *Id*. Smart filed a Third Amended Complaint. Doc. No. 29. Count V was dismissed with leave to file an amended complaint. Doc. No. 37. No amended complaint was filed. In April 2022, the matter was reassigned to me. Doc. No. 40.

After the close of a contentious discovery period, all defendants now bring separate summary judgment motions.

## STANDARD OF REVIEW

I must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under the governing law. *See id*. I must draw all inferences and resolve all doubts in favor of the non-moving party. *Id*. at 255.

The moving party bears the initial burden of identifying those portions of the record that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the opposing party must respond with facts of record that contradict the facts shown by the moving party. The opposing party may not simply deny the moving party's showing. *See id.* at 321 n.3. "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (internal citations omitted).

Where, as here, the opposing party is the plaintiff who bears the burden of proof at trial, the plaintiff must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Id.* at 322–24; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, n.11 (1986) (quoting Fed. R. Civ. P. 56(e)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Anderson,* 477 U.S. at 249). The plaintiff's evidentiary showing "must amount to more than a scintilla[] but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (quoting *Williams v. Borough of West Chester,* 891 F.2d 458, 460–61 (3d Cir. 1989)). I may rely only on admissible evidence when evaluating the parties' showings. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 94-95 (3d Cir. 1999).

**DISCUSSION**

After review of the briefings, I have attached a table listing the remaining counts and defendants. *See* Appendix A. Count I of the TAC alleges retaliation in violation of New Jersey's Law Against Discrimination ("LAD") against the County of Gloucester, Eugene Caldwell, William Glaze, Brad Schmidheiser, and Michael McLaughlin. Count II alleges LAD racial discrimination against the County, Caldwell, Glaze, Schmidheiser, and McLaughlin. Count III alleges race discrimination in violation of 42 U.S.C. § 1981 against the County. Count IV alleges 42 U.S.C. § 1981 retaliation and race discrimination against Caldwell, and § 1981 race discrimination against Glaze. Count VI alleges Malicious Prosecution, under New Jersey common law, against the County, Caldwell, Schmidheiser, and McLaughlin. Count VII alleges § 1983 First Amendment Retaliation against Caldwell. Finally, Count VIII alleges Breach of Contract against the FOP Defendants.

To summarize the briefings before me, 1) all defendants move for summary judgment on Count I; 2) all defendants move for summary judgment on Count II; 3) the County moves for summary judgment on Count III; 4) Caldwell and Glaze move for summary judgment on Count IV; 5) all defendants but for Glaze move for summary judgment on Count VI; 6) Caldwell moves for summary judgment on Count VII; and 7) the FOP Defendants move for summary judgment on Count VIII. In response to the FOP Defendants' motion, Plaintiff withdrew "claims under the LAD and for Malicious Prosecution against [the FOP] Defendants" and addressed only the breach of contract claim. Doc. No. 95-1, n. 1. I only address the FOP Defendants' motion regarding the breach of contract claim.

I first address the arguments of Defendants Schmidheiser and McLaughlin (the "Union Officials") in Section A; then the arguments of Defendants the County of Gloucester, Caldwell, and Glaze (the "County Defendants") in Section B; then, finally, the argument of Defendants NJ State FOP and Local 97 (the "FOP Defendants") in Section C.

### A.     I Grant Summary Judgment in Favor of The Union Officials on Each Count Asserted Against These Defendants.

The Union Officials move for summary judgment on Counts I, II, and VI. For the reasons set forth in the following subsections, I grant summary judgment.

> 1.     *I Grant Summary Judgment in Favor of the Union Officials on Count I: Retaliation in Violation of N.J.S.A. § 10:5-12(d).*

In Count I, Smart alleges Defendants Schmidheiser, McLaughlin, Caldwell, Glaze, and County of Gloucester retaliated after Smart engaged in protected conduct. TAC at ¶ 94. Though there is some overlap in the discussions, I address the Union Officials here and resolve the County Defendants' motion later. The alleged retaliation occurred when Schmidheiser and McLaughlin attempted to remove Smart from the union and caused him to be criminally prosecuted. *Id*. at ¶ 95. The Union Officials argue Smart failed to demonstrate retaliation, because 1) there are no facts demonstrating a causal connection between the protected activities and the alleged retaliation and 2) Defendants' legitimate, non-retaliatory rationale was not pretextual reasoning for actual retaliation. Doc. No. 79-2, at 7-19. McLaughlin and Schmidheiser also argue that all of Smart's LAD claims are precluded by a litigation privilege. *Id*. at 25-29.

*New Jersey Retaliation Standard Under the N.J.S.A. § 10:5-12(d)*

A person engages in "unlawful discrimination" when the person retaliates against an individual because the individual "shared relevant information with legal counsel,

shared information with a governmental entity, or filed a complaint . . ." against the person for engaging in acts protected under the LAD. N.J.S.A. § 10:5-12(d). To survive summary judgment, a non-moving plaintiff must show *prima facia* retaliation. *Romano v. Brown & Williamson Tobacco Corp.*, 665 A.2d 1139, 1142 (N.J. Super. App. Div. 1995). Retaliation occurs if 1) Plaintiff "was engaged in a protected activity known to the defendant;"[20] 2) Plaintiff "was thereafter subjected to an adverse employment decision by the defendant;" and 3) "there was a causal link between the two." *Romano*, 665 A.2d at 1142 (citing *Erickson v. Marsh & McLennan*, 569 A.2d 793 (N.J. 1990)); *Jamison v. Rockaway Tp. Bd. of Educ.*, 577 A.2d 177 (N.J. Super. App. Div. 1990); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)). The prima facie showing creates a presumption of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 502 (1993) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 245 (1981)). If the plaintiff can make out the three requirements, then the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason" for terminating employment. *Romano*, 665 A.2d 1139, 1142 (citing *Jamison*, 577 A.2d 177); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the defendant can demonstrate a legitimate, non-retaliatory reason, then "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext . . .." *Romano*, 665 A.2d 1139, 1142 (citing *Jamison*, 577 A.2d 177). The plaintiff can do this directly "by demonstrating that a discriminatory reason more likely than not motivated defendant's action" or indirectly "by proving that the proffered reason is a pretext for the retaliation." *Id.*

---

[20] Some cases separate the first element into two: 1) that the Plaintiff was engaged in a protected act and 2) the act was known to the defendant. *See e.g.*, *Young v. Hobart West Group*, 897 A.2d 1063, 1072 (N.J. Super. Law Div. 2005).

Meeting the summary judgment burden requires a plaintiff to raise a genuine issue of material fact regarding actual motive. *Id.* at 1143–44 (citing *St. Mary's Honor Center*, 509 U.S. 502). If the defendant presents evidence of non-discriminatory reasons, then the burden returns to the plaintiff to present evidence that would allow a reasonable factfinder to "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 1143–44 (quoting *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994)). The plaintiff's proffered evidence must allow a fact finder to reasonably determine that the defendant's alleged reason "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.*

> a.   Protected Acts for Purposes of Count I, LAD Retaliation, and Count II, LAD Discrimination.

LAD retaliation requires Smart to show he "engaged in a protected activity known to the defendant." *Id.* at 1142 (citing *Erickson*, 569 A.2d 793; *Jamison*, 577 A.2d 177; *Jalil*, 873 F.2d at 708). Here, Plaintiff made or assisted in various "complaints of race and sex discrimination." TAC at ¶ 96. These complaints occurred in April and October 2008; October 2010; and June and November 2011. *Id.* at ¶¶ 22-25, 35-36, 38, 40-41. Smart also alleges involvement in a protected activity, when, between March and July 2013, he voiced "opposition to the Jail's closure." *Id.* at ¶¶ 47-50; Schmidheiser Dep. at 113:7-114:10. Defendants argue that speaking out against the jail closure is not a protected act, because the closure affected the entire workforce rather than an individual employee. Doc. No. 79-2, at n. 2; Doc. No. 80-1, at 4-5.

The LAD prohibits an employer from firing an individual, forcing the individual's retirement, or "discriminat[ing] against such individual in compensation or in terms, conditions or privileges of employment" based on the individual's

> race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer . . . .

N.J.S.A. § 10:5-12(a). The LAD prohibits retaliation against an individual who opposed LAD forbidden acts, sought legal advice regarding LAD protected rights, "shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act. . . ." § 10:5-12(d). An employer cannot "coerce, intimidate, threaten[,] or interfere" with an employee seeking to enjoy "any right granted or protected by this act" or an employee who "aided or encouraged any other person in the exercise or enjoyment of . . . any right granted or protect by this act." *Id*.

Defendants argue that Smart's objection to the closure of the jail between March and July 2013 cannot constitute an LAD protected act. I agree. The New Jersey Supreme Court has routinely emphasized that the purpose of the LAD is to "protect the civil rights of individual aggrieved employees as well as the public's strong interest in a discrimination-free workplace." *Meade v. Township of Livingston*, 265 A.3d 148, 159 (N.J. 2021) (quoting *Rios v. Meda Pharmaceutical, Inc.*, A.3d 982, 986 (N.J. 2021)). Courts are to "liberally construe" the language "to advance [the LAD's] purposes." *Id*. Even under a broad statutory reading, speaking out on the closure of a facility during a public forum cannot constitute a protected act under the LAD's relevant sections.

The LAD clearly protects an individual seeking legal counsel, speaking with a government entity, filing a complaint, or assisting in any other LAD representation. *See id*. Opposing a jail's closure does not fall into one of these categories. Also, the jail closing does not fall into a subject of advocating for individuals within the LAD protected classes. The jail closing affected every jail employee, regardless of whether the employee is part of an LAD protected class. Smart speaking out publicly against the jail closure does not constitute an LAD protected communication for a retaliation or racial discrimination claim. The only protected acts are Smart's misconduct complaints and his assistance in other complaints.

      b.      The Record Contains No Evidence That the Union Officials Were Aware of Smart's Protected Acts.

LAD Retaliation occurs when a Plaintiff "was engaged in a protected activity known to the defendant;" Plaintiff "was thereafter subjected to an adverse employment decision by the defendant;" and "there was a causal link between the two." *Romano*, 665 A.2d at 1142 (internal cites omitted). Here, Schmidheiser and McLaughlin argue the first prong of this analysis has not been met, as the record contains no evidence that either defendant was aware of Smart's protected acts. Doc. No. 79-2, at n. 3. Plaintiff points to no evidence that Schmidheiser or McLaughlin were aware of Smart's complaints about the A-Shift officers or his assistance with other C/O's complaints. Doc. No. 92-2 at 3-5, 10-12. Plaintiff's brief makes broad assurances that the record establishes his allegations but contains virtually nothing in the way of precise identification of evidence.[21]

---

[21] For example, Plaintiff argues that "[a]s the record makes clear, McLaughlin and Schmidheiser misled the Prosecutors and PP & D by misrepresenting that Plaintiff and Capanna did not retain receipts when they ran Local 97 between January of 2008 and December of 2011. To accomplish this Schmidheiser and McLaughlin had to destroy and/or withhold the receipts." Doc. No. 92-2, at 3-4. Plaintiff further argues that "Schmidheiser's mendacity is further reflected in the lies he tells to explain that Kline and the State FOP directed him to seek criminal prosecution against Smart and Capanna." *Id*. at 4.

Summary judgment is "put up or shut up" time, and Plaintiff has not "put up."

*Berckeley*, 455 F.3d at 201.

The record before me indicates no genuine issue of material fact regarding whether the Union Officials knew of the protected acts (that Smart had made or assisted in various complaints of discrimination and misconduct in 2008, 2010, and 2011). Schmidheiser testified he was not "interviewed with regard to any allegations made against Caldwell [for] violating the fraternization policy[.]" Schmidheiser Dep. at 123:9-12. Further, in the deposition, the following exchange occurred:

> Q. [H]ave you ever had an [IA] investigation against you because of any alleged improper assault that you have made on an inmate?
> A. No.
> . . .
> Q. Did Smart ever come to you and complain that you were assaulting minority inmates on A-shift?
> A. No, sir.
> Q. Are you aware of Smart ever making any kind of complaint about A-shift assault[ing] minority inmates from any source?
> A. No, sir.

Schmidheiser Dep. at 211:17-212:24.

McLaughlin's deposition is similar, as he also testifies that he was unaware of the complaints:

> Q. Did any corrections officers ever make complaints about you and members of your shift attacking and assaulting minorities?
> A. Not to my knowledge.

---

Later, Plaintiff argues that "[t]he record is full of evidence of disdain that McLaughlin and Schmidheiser had for Smart." *Id*. at 11. Plaintiff argues that "[t]his is classic retaliation." *Id*. By way of another example, Plaintiff argues that "[t]he causation between Plaintiff's attempts to stop Defendants from abusing minorities and then their actions to undercut Plaintiff's reputation with false allegations of misappropriation and theft are obvious. A review of the record demonstrates the substantial dislike McLaughlin, Schmidheiser and Caldwell had for Plaintiff." *Id*. at 11-12.

In each example, Plaintiff makes a broad assertion that the record is full of evidence and then vaguely highlights very few examples, without specifying what is in the record or citing where it is in the record.

Q. Did any corrections officers or members of the union ever make statements in front of union members that A-shift members were wrongly attacking and/or assaulting minority inmates?
A. Not to my knowledge.
Q. Did you ever have any discussions with Eugene Caldwell, and this would have been later on towards the end of your career[,] where he informed you that Smart and/or Capanna had complained to him A-shift corrections officers including yourself were attacking and assaulting inmate minorities on the A-shift?
A. No.
Q. Did you ever have any kind of conversation with Caldwell where the discussion of the use of force on inmates on the A-shift came up?
A. No.

McLaughlin Dep. at 43:18-44:13.

I must review the record in the light most favorable to Smart. *See Anderson*, 477 U.S. at 255. Yet Plaintiff must direct me to a genuine issue to be resolved at trial by identifying specific facts contained in the record. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323-24. Smart asserts only that the Union Officials disliked him starting in 2008. Doc.[22] No. 92-2, at 11. Animosity may have existed between Smart and the named defendants, at least at some point. Merely disliking an individual is not enough for a factfinder to infer that Schmidheiser or McLaughlin were aware of Smart's protected acts. I find no evidence in the record showing that the two defendants had knowledge of the protected acts, and Plaintiff has failed to point to any.

---

[22] Plaintiff asserts that "[t]he record is full of evidence of disdain that McLaughlin and Schmidheiser had for Smart." Doc. No. 92-2 at 11. He provides no record citations. That is what he is required to do as a litigant facing summary judgment. Judges don't hunt for truffles buried in the record. *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006) (internal citations and quotations omitted). Even if the record contained evidence of disdain, "disdain" is not an actionable motive under the LAD.

I grant Schmidheiser's and McLaughlin's motion for summary judgment on Count I because Plaintiff has not shown that either defendant had the requisite knowledge of the protected acts.[23]

     c.      There Is No Evidence to Support a Prima Facie Causal Connection Between Smart's Protected Activity and the Union Officials' Alleged Retaliatory Acts.

In addition to showing the plaintiff engaged in a protected activity and suffered an adverse employment decision,[24] a plaintiff is required to show a causal link between the activity and decision. *Romano*, 665 A.2d at 1142 (internal cites omitted). The Union Officials argue Smart failed to demonstrate a prima facie causal connection between the alleged protected acts and the retaliatory acts in Count I. Doc. No. 79-2, at 10. The Union Officials argue that Smart relies on temporal proximity to infer causation. *Id*. Defendants argue a temporal proximity theory fails because the time between the protected acts and alleged retaliation was not sufficiently close to infer causation. *Id*.

Plaintiff responds that temporal proximity between the protected acts and the retaliation does not "matter because the record demonstrates that from February of 2012 until September of 2013, McLaughlin and Schmidheiser engaged in multiple acts of retaliation and animus towards Plaintiff" and provides three specific instances in 2013. Doc. No. 92-2, at 11. Plaintiff, without citations to the record, states that "the record is full of evidence" of the Union Officials' disdain for Smart spanning between

---

[23] Defendants Schmidheiser and McLaughlin also argue that they cannot be held liable for LAD retaliation (Count I), because they were Smart's co-workers. Doc. No. 79-2, at 9-10. I need not decide this issue, because Plaintiff has failed to provide evidence that the Union Officials have engaged in any form of retaliatory conduct, discussed below.

[24] For this argument, the Union Officials do not dispute if an adverse employment action occurred. *See* Doc. No. 79-2, at 9 ("Even presuming, for purposes of this motion only, . . . that [Smart] was subjected to an adverse employment action when he was suspended without pay after being charged with a criminal offense. . .").

2008 through 2018, when the defendants testified at the criminal trial. *Id.* In reply, the Union Officials argue Smart relies on assertions, not additional evidence, which is insufficient to meet the prima facie burden. Doc. No. 97, at 5-7.

A plaintiff demonstrates prima facie "causation by showing: (1) a close temporal relationship between his report and discharge, or (2) that the proffered evidence, looked at as a whole, raises the inference of causation." *Incorvati v. Best Buy Co.*, No. 10-cv-01939, 2010 WL 4807062, at *3 (D.N.J. Nov. 16, 2010) (Kugler, J.) (quoting *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 232 (3d Cir. 2007)). "Federal precedents applying our LAD in similar circumstances have utilized the same elements for purposes of the *prima facie* case." *El-Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170, 1188 (N.J. Super. App. Div. 2005) (italics in original) (citing *Abramson v. William Paterson College*, 260 F.3d 265 (3d Cir. 2001); *Mancuso v. City of Atlantic City*, 193 F. Supp. 2d 789, 811 (D.N.J. 2002)).

Here, Smart's protected acts occurred between April 2008 and November 2011. TAC at ¶¶ 22-25, 35-36, 38, 40-41, 96. The first instance of alleged retaliation occurred in "late 2012," when Schmidheiser and McLaughlin initiated a vote to expel Smart from Local 97. Smart Dep. at 177:10-182:10. The last instance of retaliation, according to Smart, occurred when Schmidheiser and McLaughlin testified against Plaintiff in late 2018. Doc. No. 92-2, at 17; October 5, 2018 Order.

i.   Temporal Proximity Alone Does Not Indicate Causation.

Courts have held that temporal proximity causation is a high burden that requires the adverse action to occur "within a few days of the protected activity." *El-Sioufi*, 887 A.2d at 1188 (quoting *Rooks v. Alloy Surfaces Co., Inc.*, No. 09-cv-00839,

2010 WL 2697304, at *2 (E.D. Pa. July 06, 2010) (Goldberg, J.)). Defendants rely on cases[25] in which courts have held that the inference of adverse action is appropriate "where two days passed between the protected activity and the alleged retaliation, but not" after many months had passed. *Est. of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (citing *Jalil*, 873 F.2d at 708 (finding appropriate temporal proximity); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d. Cir. 1997) (finding inappropriate temporal proximity)). In this matter, temporal proximity does not allow a causal inference as a matter of law. The amount of time between the last alleged protected activity and the first claimed retaliation extends beyond the accepted proximity of days. The timing is months, perhaps a year—November 2011 to "late 2012"—which, alone, is insufficient to infer causation.

ii.      The Record Contains No Other Evidence Suggesting Causation.

Smart asserts causation exists because the Union Officials disliked him starting in 2008 through 2018 and that the record contains plenty of evidence to demonstrate their dislike. Doc. No. 92-2, at 11. Defendants respond that Plaintiff does not argue a causal link between the relevant time periods. Doc. No. 97, at 4-7. I find the record does not indicate prima facie causation.

When temporal proximity fails "the plaintiff must set forth other evidence to establish the causal link." *Young*, 897 A.2d at 1073–74 (internal citations omitted); *Marasco*, 318 F.3d at 513. Other evidence can be "antagonistic conduct or animus by the

---

[25] Cases include *Thomas v. Town of Hammonton*, 351 F.3d 108, 114, 116 (3d Cir. 2003) (holding that three weeks was too remote); *Thompson v. Anthem Companies, Inc.*, Civil Action No.: 18-6676 (ES) (CLW), 2019 WL 2591100, *6 (D.N.J. 2019) (holding that two months was too remote); and *Tinio v. Saint Joseph Regional Medical Center*, Civil Action No. 13–829(JLL)(JAD), 2015 WL 1530912, at *8 (D.N.J. April 6, 2015) (holding that twenty-two months was too remote).

employer," "inconsistent reasons proffered by the employer," or any other circumstantial evidence which would establish a basis for an inference of causation. *Incorvati*, 2010 WL 4807062, at *3 (citing *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007); *Treaster v. Conestoga Wood Specialties Corp.*, No. 09-cv-00632, 2010 WL 2606479, at *21 (M.D. Pa. Apr. 29, 2010) (Smyser, M.J.)). Mere suggestion of causation is not affirmative evidence that "could convince a reasonable jury of the causal link." *Marasco*, 318 F.3d at 513; *see also El-Sioufi*, 887 A.2d at 1189. Rather, a plaintiff must show that the alleged retaliatory act was "linked" to the protected act. *Krouse*, 126 F.3d at 503-04. Plaintiff must point to evidence suggesting an "intent to retaliate." *Marasco*, 318 F.3d at 513. Here, Smart's argument fails. He does not point to circumstantial evidence that links the protected activity and the alleged retaliation; he presents only accusations. This is fatal at summary judgment.

Smart's position is founded on the argument that "Smart was considered a troublemaker when he made these complaints. The record is full of evidence of the disdain that McLaughlin and Schmidheiser had for Smart." Doc. No. 92-2, at 11. According to Smart, the "distain began in 2008 and did not abate any time before [the Union Officials] provided false accusations against him to the Prosecutor's Office in 2013 and up until the time that they testified against him at the criminal trial in 2018." *Id.* In his argument, Plaintiff has not cited to this abundance of evidence, or indeed any evidence, in the record.[26] Smart has not pointed to admissible evidence that would permit a reasonable jury to conclude that either Schmidheiser or McLaughlin engaged in

---

[26] For a litigant facing summary judgment these citations are a requirement. *See Doeblers'*, 442 F.3d at 820 (citations and internal quotes omitted).

continuous conduct that would link the protected acts to retaliation on the part of the defendants.

I have reviewed the record for possible evidence of the disdain Smart refers to in his argument. Smart's counter statement of facts indicates that the Union Officials spread rumors and posted false information regarding Smart during the eight-month period between November 2011 and February 2012. Doc. No. 92-1, at ¶¶ 43, 45-46 (referencing Doc. No. 92-6, Exhibit M, Donald Holmes' Deposition ("Holmes Dep.")). As to the posting of fliers, Smart's statement of facts provides that "A-Shift Officer[s] McLaughlin and Frontado displayed animosity toward Capanna and Smart and were 'putting out false information.' False postings were placed on the work place bulletin board, hallways[,] and in the latrine." *Id*. at ¶ 45 (citing to Holmes Dep., at 49-50). Yet, the deposition cited discusses animosity directed towards Capanna, not Smart. *See* Holmes Dep., at 48:15-49:20. Holmes was asked "Did you ever see an Officer Hickman hang up copies of an article about the Vineland PBA president/treasurer stealing money from their union?" *Id*. at 49:21-24. The record contains no evidence that the Vineland PBA union is Local 97; there is also no evidence that the "president/treasurer" referenced was Smart or someone else. Even if I do infer that this question regards Smart, the testimony is not material to Smart's case. Officer Hickman is not Schmidheiser or McLaughlin. There is no evidence that the Union Officials were involved in the flier postings.

The only other place the record refers to possible disdain are references to spreading rumors in Smart's and Capanna's depositions. However, the depositions rely on inadmissible hearsay. Plaintiff does not expand on this point—he fails to provide any hearsay exception or exemption in his argument. *See* Doc. No. 92-2. I cannot rely on

inadmissible evidence during summary judgment. *See Blackburn*, 179 F.3d at 94-95. In his deposition, Capanna discusses a rumor he was told by another C/O, Raymond Childs ("Childs"). Capanna Dep., at 163:11-164:25. Smart's deposition also discusses the rumor heard by Childs. Smart Dep. at 304:13-305:18. Smart recounts Childs telling him of a conversation overheard between Schmidheiser and another, not deposed, C/O. *Id*. I cannot consider either Capanna's or Smart's testimony, as Childs' narrative is inadmissible. *See Blackburn*, 179 F.3d at 94-95. While a statement by Schmidheiser may be admissible if used against him, *see* Fed. R. Evid. 801(d)(2)(a), Childs' out of court statement is inadmissible hearsay because Childs' statement is proffered for its truth. Fed. R. Evid. 801(a)-(c).

My analysis will not include evidence regarding the posting of the fliers, as it is irrelevant, and I cannot consider evidence regarding the spreading of rumors, as that evidence is inadmissible. As a result, the record neither contains evidence regarding the Union Officials engaging in misconduct between 2008 and 2011 nor does it contain any admissible evidence from November 2011 through February 2012. The gap in time is fatal to Smart because the record must indicate or allow an inference of a continuous showing of the circumstantial evidence between the protected act and the retaliation. *See Woodson*, 109 F.3d at 922; *Maslanka*, 2008 WL 918499. Thus far, Smart has not pointed to any admissible evidence of a causal link between 2008 and February 2012.

Smart next argues "the record demonstrates that from February 2012 until September 2013, McLaughlin and Schmidheiser engaged in multiple acts of retaliation and animus towards Plaintiff."[27] Doc. No. 92-2, at 11. First, Schmidheiser sought

---

[27] Smart argues this conduct was retaliation, not evidence of a causal link between the protected activity and the alleged retaliatory acts (attempted removal from Local 97 and the Union Officials going to the

"assistance from Caldwell, who provided [Schmidheiser] entree to the Prosecutor's Office" in March 2013; second, McLaughlin "made sure to send one last email to George Kline accusing Plaintiff of misappropriation" prior to McLaughlin's retirement in June 2013; and third, McLaughlin met with the Prosecutor's Office in September 2013 "to falsely accuse Plaintiff of theft." *Id.* Smart fails to identify any circumstantial evidence occurring between February 2012 and March 2013.

Smart argues that the Union Officials disliked him, and their actions that demonstrate this dislike provide the requisite causal link. Smart's argument aligns most closely with the "antagonistic conduct" argument found in *Marra*, 497 F.3d at 302. Therefore, I use antagonistic conduct cases as a framework for my analysis. I reiterate that personal dislike is not a forbidden retaliatory animus under the LAD. In *Ahmed v. Interstate Management Co.*, the District of New Jersey granted summary judgment finding that Ahmed failed to show causation via a pattern of antagonism. No. 11-cv-00683, 2012 WL 3038523, *13 (D.N.J. 2012) (Hochberg, J.). The reviewing court found that the record did not indicate a period of antagonism, because each time the plaintiff complained of antagonistic conduct the conduct ceased and supervisors were not engaged in the conduct. *Id.*

Conversely, in *Maslanka v. Johnson & Johnson, Inc.*, the District of New Jersey denied summary judgment because Maslanka set forth continued antagonistic conduct. No. 04-cv-05477, 2008 WL 918499, *23 (D.N.J. 2008) (Wolfson, J.). Maslanka filed an EEOC complaint, a protected act, in April 2001 after a car ride where Maslanka's direct supervisor harshly criticized him. *Id.* The supervisor's antagonistic behavior continued

---

Prosecutor's Office). I treat these acts from March, June, and September 2013 as circumstantial evidence, because the TAC does not include the conduct as retaliatory acts. *See* TAC, at ¶ 95.

after the complaint. In May 2001, plaintiff complained about "hostile behavior during ride-with sessions, repeated threatening remarks regarding [Maslanka's] career with Johnson and Johnson, and use of intimidating tactics." *Id*. In September 2002, Maslanka complained of continued antagonistic conduct between December 2001 through September 2002. *Id*. Last, prior to the retaliatory act, Maslanka alleged that the supervisor called him when there was to be no contact between them and "demand[ed] a meeting the next day." *Id*. *Maslanka* provides an example of what constitutes a continuous course of conduct that supports a causal inference.

Smart's evidence does not constitute the requisite evidence that "could convince a reasonable jury of the causal link" based on a theory of antagonistic conduct. *See Est. of Smith*, 318 F.3d at 513. Smart argues the Union Officials engaged in only three actions between 2008 and 2013. All were contained within approximately eight months of the final year of this six-year time span. The *Maslanka* court's decision certainly suggests that such a lengthy gap between a scant three incidents is insufficient, as Maslanka's reports indicated nearly monthly instances of his supervisor yelling and threatening his job security. 2008 WL 918499, *23. None of the conduct was immediately directed at Smart. *See id*. Furthermore, upon review of the record, Smart speculates that McLaughlin and Schmidheiser did not like him, because he and Capanna tried to remove a friend of McLaughlin and Schmidheiser's from the union. Smart Dep. at 304:13-305:18. If true, Smart's own speculation on the motives for the Union Officials' actions against him would make them non-actionable under the LAD. Not liking someone for personal reasons does not amount to retaliating based on a protected activity.

28

Smart's final argument is that the Union Officials' concern regarding Smart's recordkeeping as union treasurer was "comical." Doc. No. 92-2, at 11. This argument, unsupported by facts in the record, is insufficient. In refuting the Union Officials' stated concern, Smart argues Local 97's assets grew from $42,000 to $102,000 under Smart's oversight as Treasurer. *Id*. at 11-12. Nothing about the increase in assets makes a causal link between protected acts and retaliation more likely. Smart seems to be making a pretext argument—that reporting him to the criminal authorities was not done because of genuine concern over financial improprieties but rather for a retaliatory animus. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992). The argument says nothing about the causal link between protected acts and alleged retaliation. Even as a pretext argument it lacks probative force. The world is filled with unions who are both rich and are victims of financial improprieties. Crooks don't steal just from the poor.

In sum, Plaintiff merely suggests that disdain prompted the Union Officials to act. Plaintiff, without citation to the record, argues that Schmidheiser and McLaughlin's dislike for Smart began in 2008 and these defendants engaged in acts of retaliation between February 2012 and March 2013. Doc. No. 92-2, at 10-12. Plaintiff presents conclusory arguments without showing where these facts are in the record or providing a clear explanation for how these acts constitute a viable form of retaliation. *See id*. at 11. Furthermore, certain evidence Smart does cite, rumors and posted fliers, are inadmissible or not probative. Plaintiff has not demonstrated a continuous causal link between the protected acts and the Union Officials' alleged retaliation. I grant summary judgment in favor of Defendants Schmidheiser and McLaughlin as to Count I.

        d.       Plaintiff Has Not Shown the Union Officials' Alleged Legitimate, Non-Retaliatory Rationale Was a Pretext for a Retaliatory Animus.

Plaintiff has not shown prima facie causation in Count I against the Union Officials. Even if he did, Smart's LAD retaliation claims would fail as he has not shown that Defendants' evidence of legitimate, non-retaliatory reasoning for their actions were mere pretext for retaliation. The Union Officials argue there is no proof that the legitimate, non-retaliatory reasons they have provided for their actions were, in fact, a pretext for retaliation. Doc. No. 79-2, at 12. Smart does not directly respond to the Union Officials' pretext argument.[28] Instead, when Smart made his causation argument, he argues that the motive for reporting Smart's alleged misappropriation to the prosecutor was disdain, not that the Union Officials believed Smart misappropriated funds. Doc. No. 92-2, at 11-12. I have briefly discussed why this argument fails above; however, I discuss why in more detail now.

Employment discrimination cases are either "pretext" or "mixed-motives" cases. *Ezold*, 983 F.2d at 522 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n. 12 (1989) (plurality)). When reviewing pretext cases, I must apply the *McDonnell Douglas/Burdine* analysis. *Ezold*, 983 F.2d at 522. This analysis requires the plaintiff to demonstrate "by competent evidence that the presumptively valid reason for the alleged unlawful employment action was in fact a coverup for a . . . discriminatory decision." *Id.* at 523 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 805).

---

[28] This is reason enough to enter summary judgment. *See Celotex*, 477 U.S. at 322 (summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial"). "There is no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable fact finder could return a verdict in that party's favor." *Knappe & Koester, Inc. v. Barrett & Blandford Assocs.*, Inc., CIV. No. 88-3405 (CSF), 1990 WL 49814, at *2 (D.N.J. Apr. 16, 1990) (citing *Anderson*, 477 U.S. at 249.).

At summary judgment, the plaintiff must show a genuine issue of fact regarding motive. *Romano*, 665 A.2d 1139, 1143–44 (citing *St. Mary's Honor Ctr.*, 509 U.S. 502). The plaintiff must present evidence that would prompt a reasonable factfinder to either 1) disbelieve the proffered reasons, or 2) "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 1143–44 (quoting *Fuentes,* 32 F.3d 759). Plaintiff's burden at summary judgment is not intended to be onerous; "it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (2005) (internal citations omitted).[29] To survive summary judgment, "a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 626 (D.N.J. 2014) (quoting *Zive*, 867 A.2d at 1140).

The Union Officials describe the following legitimate reasoning that prompted their decision-making. *See* Doc. No. 79-2, at 14-19. When McLaughlin was elected Local 97 Treasurer, he requested all documentation from Local 97 President Smart's tenure as Treasurer. Smart Dep. at 324:1-325:6; 334:2-335:23. Smart was unable to provide all the requested documentation because portions of the paperwork were with Ronald Ford ("Ford"), who was refusing to cooperate. *Id.* at 326:2-327:12. After Smart stepped down as President and the document issue had yet to be resolved, McLaughlin went to

---

[29] *Zive* cites several cases relevant to my analysis. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253 (a prima facie burden is "not onerous"); *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir.1994) (establishing a prima facie case is "relatively simple"); *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 118 (3d Cir.) (a prima facie case is to be "easily made out"); *Peper v. Princeton Univ. Bd. of Trustees*, 389 A.2d 465, 478 (1978) ("the standard for presenting a *[p]rima facie* case cannot be too great lest rampant discrimination go unchecked."). *Zive*, 867 A.2d at 1139.

Schmidheiser, the new president, with concerns about the discrepancies. Schmidheiser Dep. at 56:24-60:23. McLaughlin sent a letter to Smart outlining his concerns regarding hundreds of transactions that were not reflected in the books; Smart did not respond. 2/7/12 McLaughlin Letter, at 1; Smart Dep. at 336:24-337:17.

Plaintiff does not directly respond. Briefly, when discussing causation, Plaintiff argues the Union Officials' reason for claiming theft charges were unsubstantiated because the assets of Local 97 grew from $42,000 to $102,000 during Smart's tenure as Treasurer. Doc. No. 92-2, at 11-12. Smart argues the asset growth makes it obvious that the reason for reporting alleged misappropriation to the prosecutor originated from disdain, not genuine concern that Smart was guilty of wrongdoing. *Id.* But, as I have said, disdain is not a prohibited motive.

Plaintiff's argument is a conclusory *non sequitur* and his assertion that Local 97's assets increased from $42,000 to $102,000 says nothing about whether the Union Officials genuinely thought "that questionable transactions lacking documentary support" occurred. *See* Doc. No. 97, at 7. A reasonable jury must be able to ascertain from the evidence that the Union Officials acted with a discriminatory intent. *See Zive*, 867 A.2d at 1140 ("[A] plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent. That burden merges with the plaintiff's ultimate burden of persuading the court that she or he was subjected to intentional discrimination." (Internal citations omitted)). At most, when viewing Plaintiff's argument in the light most favorable to him, he asserts that the Defendants' decision was improperly motivated by "disdain." The first and most glaring problem with Plaintiff's argument is that it is an assertion unsupported by any

citation to facts in the record. The second problem is that even if the Union Officials were motivated by disdain for Smart, that motivation is not prohibited under the LAD.

I draw from *Maddox*: "[t]his Court does not sit to second-guess employment decisions, however wrongheaded. . .. The court must look past general contentions that a firing was unfair or unwise, and determine whether it was driven by a *prohibited* motive. . .." 50 F. Supp. 3d at 626 (emphasis in original). My role is not to second-guess union decisions to alert authorities to possible wrongdoing, especially when that report results in a year-plus long, independent investigation by the prosecutor that resulted in an independent finding of probable cause for possible illegal activity. My role is to determine if the Plaintiff made out a plausible evidentiary bases upon which a jury could conclude there is a possibility that the proffered, non-discriminatory reason was false, and that the defendants may have had a discriminatory intent. Plaintiff has not done so here.

Smart has not presented evidence that indicates a material issue of fact that the Union Officials' reasons were mere pretext for retaliation. I find in favor of the Union Officials as to Count I.

> e.     The Litigation Privilege is Applicable to Defendants
>         Schmidheiser and McLaughlin in the NJ LAD Claims.

The Union Officials argue that Count I's alleged retaliatory conduct is protected under the litigation privilege. Doc. No. 79-2, at 25. Smart responds that the litigation privilege cannot be asserted "[b]ecause Plaintiff pleads a malicious prosection [sic] claim and the record and arguments made herein demonstrate that there is considerable evidence of Defendants' malicious and reckless disregard for the truth. For these

obvious reasons, Defendants are not entitled to the litigation [sic] privilege."[30] Doc. No. 92-2, at 16-17. The Union Officials reply their argument relates not to the malicious prosecution claim, but the LAD claims. Doc. No. 97, at 11-12.

The litigation privilege applies to citizens when making "statements to authorities for the prevention and detection of crime." *Wright-Phillips v. United Airlines, Inc.*, No. 20-cv-14609, 2021 WL 1221111, at *19 (D.N.J. Apr. 1, 2021) (McNulty, J.) (quoting *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 516 A.2d 220, 226 (N.J. 1986)) (citing *Moreau v. Walgreen Co.*, 387 F. App'x 202, 204 (3d Cir. 2010)). The litigation privilege is available in civil rights cases, including LAD cases, and may be conferred on witnesses "for the purpose of advancing the truth-seeking function of the judicial process" but it cannot be extended when the individual "willfully and maliciously commenced a frivolous and blatantly unconstitutional garnishment action. . .." *Loigman v. Twp. Comm. of Twp. of Middletown*, 889 A.2d 426, 435, 584 (N.J. 2006) (discussing whether the privilege protects an attorney in a § 1983 claim). The privilege does not apply when the individual making the statements "has full knowledge of its untruthfulness." *Wright-Phillips*, 2021 WL 1221111, at *19 (quoting *Geyer v. Faiella*, 652 A.2d 1245, 1248 (N.J. Super. App. Div. 1995)).

Plaintiff argues that the litigation privilege is prohibited in malicious prosecution cases. It is well established in New Jersey that the litigation privilege does not protect an individual from liability for malicious prosecution. *Loigman*, 889 A.2d at 436, n. 4;

---

[30] I reiterate that "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd.*, 455 F.3d at 201. The portion of Smart's memorandum of law I have quoted is the entirety of his argument on the subject. There is one paragraph prior which discusses the legal standard for when the privilege does not attach. I shall not dig for any more truffles. *See Doeblers*, 442 F.3d at 820 (citations and internal quotations omitted).

*Dello Russo v. Nagel*, 817 A.2d 426, 433 (N.J. Super. App. Div. 2003); *Hill v. New Jersey Dep't of Corr. Com'r Fauver*, 776 A.2d 828, 841 (N.J. Super. App. Div. 2001) (citing *Rainier's Dairies v. Raritan Val. Farms*, 117 A.2d 889, 895 (N.J. 1955); *Baglini v. Lauletta*, 768 A.2d 825 (N.J. Super. App. Div. 2001)). Defendants assert the privilege for only the LAD claims, not all claims. Doc. No. 97, at 11-12. Therefore, I must determine if the litigation privilege applies to the LAD claims.

 *Rainier's Dairies* presented a situation akin to what is before me. *See* 117 A.2d 889 (N.J. 1955). There, after Defendants filed fruitless certifications of an illegal dairy agreement between the plaintiff and a third-party, Rainier's Dairies sought judgment for libel and malicious interference with its business. The lower court granted summary judgment for the libel claim because the litigation privilege was applicable. *Id.* at 890-91. The lower court denied leave to amend the complaint, finding the plaintiff failed to make out the essential elements for malicious prosecution. *Id.* at 890-91. The New Jersey Supreme Court affirmed that the litigation privilege applied to the libel count. *Id.* at 894. The Court was also "equally satisfied that the principles supporting an action in the nature of malicious prosecution . . . may be invoked" and remanded to allow the plaintiff to file an amended complaint to include malicious prosecution. *Id.* at 895. The New Jersey Supreme Court's decision allowed a defendant to invoke the litigation privilege while also allowing the plaintiff to pursue a malicious prosecution claim. It is appropriate for the Union Officials to assert the litigation privilege for Counts I and II even though Count VI advances a malicious prosecution claim.

 I turn now to determine if the privilege is applicable. The litigation privilege is meant to protect "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the

litigation; and (4) that have some connection or logical relation to the action." *Loigman*, 889 A.2d at 437 (quoting *Hawkins v. Harris*, 661 A.2d 284, 284 (N.J. 1995)). The privilege applies when witnesses communicate with authorities "for the prevention and detection of a crime." *Wright-Phillips*, 2021 WL 1221111, at \*19. This is exactly what occurred when Schmidheiser spoke with Garbarino and when McLaughlin responded to Garbarino's request. I find that the Union Officials are protected under the litigation privilege in Counts I and II.

> 2. *I Grant Summary Judgment in Favor of the Union Officials on Count II: NJLAD Racial Discrimination.*

The Union Officials argue that the litigation privilege attaches to Smart's LAD claims. I have found that the litigation privilege attaches. *See supra* pp. 33-36. For completeness, I will briefly review the Union Officials' arguments as to Count II: NJLAD racial discrimination.

Smart alleges the Union Officials engaged in racially discriminatory conduct in violation of the LAD. TAC at ¶ 103; *see* N.J.S.A. § 10:5-12(a). Smart argues the alleged racial discrimination occurred when these defendants caused Smart "to be criminally prosecuted and suspended because of his race . . . ." *Id*. The Union Officials argue for summary judgment because the claim is barred by the two-year statute of limitation and there is no evidence that the defendants aided and abetted in any racial discrimination. Doc. No. 79-2, at 20-25. Smart responds that Judge Rice previously resolved the statute of limitation issue. Doc. No. 92-2. Plaintiff does not directly respond to the Union Officials' argument regarding aiding and abetting; Plaintiff only argues these defendants' role in LAD Retaliation. *See id*. at 10-12. Rather, Plaintiff argues that the

County endorsed the "11[-]month criminal investigation based on false allegations made by Defendants McLaughlin and Schmidheiser" against "Plaintiff and Capanna." *Id.* at 3.

*Racial Discrimination Standard under N.J.S.A. § 10:5-12(a).*

The NJLAD "prohibits discrimination because of race, creed, color, national origin, ancestry, age, sex, gender identity or expression, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, disability or nationality." *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 230 (D.N.J. 2014) (citing N.J.S.A. §§ 10:5–3, 10:5–12(a)). For a successful LAD race discrimination claim, Smart "must first establish that: (1) [he] is a member of a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) that [the] adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016).

As in LAD Retaliation claims, once plaintiff has set forth a showing of these four elements, there is "a *prima facie* case of discrimination" and the burden shifts according to *McDonnell Douglas*. *Id.*; *see also McDonnell Douglas Corp.*, 411 U.S. 792. The defendant then has the burden to demonstrate a legitimate, non-retaliatory reason for the actions. *Id.* at 392. Once shown, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext . . .." *Romano*, 665 A.2d 1139, 1142 (citing *Jamison*, 577 A.2d 177). The plaintiff can do this directly "by demonstrating that a discriminatory reason more likely than not motivated defendant's action," or indirectly "by proving that the proffered reason is a pretext for the retaliation." *Id.*

a.  The Record Contains No Evidence that the Union Officials Aided or Abetted Discriminatory Conduct.

The Union Officials argue Count II is baseless because there is no evidence that they aided and abetted the County's alleged discriminatory conduct. Doc. No. 79-2, at 24-25. Plaintiff argues that the County endorsed the "11[-]month criminal investigation based on false allegations made by Defendants McLaughlin and Schmidheiser" against "Plaintiff and Capanna." *Id.* at 3.

The NJ LAD provides that an employer and an employee cannot "aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J.S.A. § 10:5–12(e). This provision "does permit individual liability, albeit by [an] awkward route. . .." *Mann v. Est. of Meyers*, 61 F. Supp. 3d 508, 529 (D.N.J. 2014). To hold an employee liable under this standard, Smart must demonstrate that 1) the County of Gloucester, as the aided party, performed a wrongful act that caused an injury; 2) Schmidheiser or McLaughlin were "generally aware of [their] role as part of an overall illegal or tortious activity at the time that [they] provide[d] the assistance"; and 3) Schmidheiser and McLaughlin "knowingly and substantially assist[ed] the principal violation." *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004) (citing *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999)).[31] There are five factors used to determine if the assistance was knowingly and substantially done: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time

---

[31] In *Hurley*, the Third Circuit found that a nonsupervisory employee's harassment could not fall under the LAD's aiding and abetting provision, because the non-supervisory employee cannot "substantially assist the employer in its wrong, which is its failure to prevent and redress harassment by individual employees." *Hurley*, 174 F.3d at 129. Like *Hurley*, Schmidheiser and McLaughlin are co-employees with Smart as they all are C/Os. Unlike *Hurley*, Schmidheiser and McLaughlin held a position of authority over Smart in the union, as they were the President and Treasurer at the time they went to the police. *See Baliko*, 645 A.2d 1218. The question remains open if their position as members of the union board can be equated to that of a supervisor. As there are other reasons for my decision to grant summary judgment, I do not resolve this question.

of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." *Rowan v. Hartford Plaza Ltd.*, No. L-3106-09, 2013 WL 1350095, at *7 (N.J. Super. App. Div. Apr. 5, 2013) (internal cites omitted).

Smart alleges three discriminatory acts: 1) Smart was suspended because of his race, 2) he did not receive backpay,[32] and 3) he was subjected to an improper IA investigation. Doc. No. 92-2, at 3. Plaintiff also argues that the County endorsed the "11[-]month criminal investigation based on false allegations made by Defendants McLaughlin and Schmidheiser" against "Plaintiff and Capanna." *Id.* at 3. Smart's argument regarding the Union Officials alleged discriminatory acts are presented under the section arguing that "Defendants Are Not Credible." *Id.* at 3-4. It is well established that credibility determinations and evidentiary weighing are not appropriate at summary judgment and must be reserved for the fact finder. *Anderson*, 477 U.S. at 255. Smart's argument also provides no clear references to the record. *See* Doc. No. 92-2, at 3-5.

Plaintiff puts forth the following allegations to support his claim that the Union Officials aided and abetted the County's racial discrimination. First, Defendants misled both prosecutors and PP&D by "misrepresenting that Plaintiff and Capanna did not retain receipts when they ran Local 97" via "destroy[ing] and/or withhold[ing] the

---

[32] Smart's own deposition indicates otherwise: "Q. Did you receive any other compensation? / A. Back pay. / Q. Did you receive the full back pay that you were entitled to? / A. I believe so." Smart Dep. at 213:24–214:4. The issue of withholding backpay as a discriminatory act was also not raised in the Third Amended Complaint. *See* TAC at ¶ 95 ("By and through its course of conduct as alleged herein, Defendants retaliated against Plaintiff by attempting to remove him from union leadership and causing him to be criminally prosecuted and suspended for a supposed violation that Defendants knew was baseless."). Plaintiff does request backpay as a remedy, but not an actionable injury. Thus, I will not include this prong in the analysis. *See Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (the "Sham Affidavit Doctrine" does not allow a party to "create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991)).

receipts." *Id*. at 4. Second, Plaintiff alleges Schmidheiser stated he was directed to seek criminal prosecution from the State FOP. *Id*. Third, Garbarino relied on the Union Officials' "false" allegations, and the "lengthy record" supports Smart's claim that the Union Officials represented to Garbarino that Smart and Capanna engaged in misappropriation or theft. *Id*. Fourth, "[t]he gap in time from when the PP&D report is issued, February 14, 2013, and when Schmidheiser goes to the Prosecutor is also suspicious," because Schmidheiser and Caldwell met "on a regular, if not daily, basis." *Id*. at 4-5.

There are two issues with Smart's response. First, there is no quotation, citation, or clearly defined examples of the evidence contained in the "lengthy record" or the statement of facts to support Smart's arguments. This does not suffice. *See Berckeley*, 455 F.3d at 201 (internal citations omitted). Second, Smart's argument loops in Capanna as a colleague who was also persecuted by these defendants. However, the record does not identify Capanna as an individual in a protected class. It is difficult to understand how Smart was the victim of racial discrimination when Capanna, who is not a member of a protected class, was also referred to the prosecutor's office for the same conduct.

Smart must demonstrate that the Union Officials "knowingly and substantially assist[ed] the principal violation" to pass the third prong of the aiding and abetting analysis. *Tarr*, 853 A.2d at 929 (citing *Hurley*, 174 F.3d at 127). *Tarr* makes clear that New Jersey follows the Restatement of Torts' definition. *Id*. (citing Restatement (Second) of Torts § 876 (1979)). The Restatement[33] provides that liability can be

---

[33] The Restatement says there is harm if the aider and abettor "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c)

imposed only if the aider and abettor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Id.* Plaintiff presents the Union Officials' conduct in a manner which leads to the inference that the Union Officials treated Smart and Capanna equally. Treating an individual of a protected class equally with a person not part of a protected class is not providing "substantial assistance or encouragement to the [County]" to engage in racial discrimination.

I must also reiterate that, upon review of the record, Smart speculates that the Union Officials engaged in this conduct because Smart attempted to remove one of the Union Officials' friends from the union. Smart Dep. at 304:13-305:18. If true, such a motive would make the Union Officials' conduct non-actionable under the LAD. Not liking someone for personal reasons is neither discrimination nor evidence of aiding and abetting racial discrimination. I find that Smart's allegations do not provide the basis for an inference that the conduct was motivated by Smart being a member of a protected class.

I discuss the County's Count II summary judgment motion is Section B.2. *See infra* pp. 67-73. There, I grant summary judgment in favor of the County because Smart has not shown prima facie discrimination by a wrongful act. *Id.* This holding is relevant to the Union Officials' analysis, because the first prong of the aiding and abetting analysis requires Smart to show that the aided party, the County of Gloucester, performed a wrongful act that caused an injury. *See Tarr*, 853 A.2d at 929 (citing *Hurley*, 174 F.3d at 127). Without showing a wrongful act, the Union Officials cannot

---

gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." § 876.

have aided or abetted the County in violation of the LAD. The claim must fail. Both because Smart has failed to show racial animus on the part of the Union Officials and because he has not shown a wrongful act, I grant summary judgment on Count II in favor of the Union Officials.

        b.        Litigation Is Time Barred Against the Union Officials.

The Union Officials argue that Count II is barred by the two-year statute of limitations. Doc. No. 79-2, at 20-23. Defendants submit that "all the acts which Plaintiff contends constituted racial discrimination by Schmidheiser and McLaughlin are alleged to have occurred well outside the two-year window preceding the August 19, 2016 filing date." *Id*. at 21. Smart responds that 1) Judge Rice resolved the argument and 2) "discriminatory and retaliatory acts of Schmidheiser continued after Plaintiff filed his initial complaint. The[y] both showed up to testify against Plaintiff in October 2018." Doc. No. 92-2, at 17. In their reply brief, the Union Officials submit that though the motion to dismiss was denied under the relation back doctrine, "Judge Rice left open the possibility that the claim could ultimately be found untimely as to Schmidheiser and McLaughlin if their alleged misconduct was determined to have occurred more than two years before the filing of the original complaint." Doc. No. 97, at 9 (citing J. Rice 12/30/21 Memorandum, at 14). Defendants argue discovery reflects that the alleged discriminatory conduct occurred outside of the statute of limitations preceding the original complaint. *Id*. at 9-10 (citing Doc. No. 79-2, at 20-23).

The record contains no evidence that the Union Officials engaged in racially discriminatory conduct when Schmidheiser approached the Prosecutor's Office and provided a statement, when McLaughlin responded to the investigator's request for a

statement, and when both testified at the 2018 trial. There are no acts that fall within the two-year statutory period regarding Union Officials' conduct.

I look to Judge Rice's opinion because Smart incorporates Judge Rice's opinion in lieu of providing argument. In reviewing the Union Officials' Motion to Dismiss the Second Amended Complaint, Judge Rice held that the statute of limitations was not violated, because the most recent complaint related back to the date of the original pleading under Federal Rule of Civil Procedure 15(c). Doc. No. 26, at 12. At the conclusion of his analysis, Judge Rice held the complaint could not be dismissed, "[b]ecause it is not apparent on the face of the complaint that Smart's LAD discrimination claim against Schmidheiser and McLaughlin is barred by the statute of limitations." *Id*. at 14 (internal quotations omitted).

The standard for a motion to dismiss is defined by the Rule 12(b)(6) of the Federal Rules of Civil Procedure. A presiding judge may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The review is to confirm that the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is different than the summary judgment standard. On that basis, I review the record to determine if the claim was timely brought.

LAD racial discrimination claims "shall be commenced within two years next after the cause of any such action shall have accrued." N.J.S.A. § 2A:14-2. A claim accrues when the plaintiff becomes aware, or should have become aware, of the injury resulting from the illegal act. *See Wade v. Armstrong World Industries, Inc.*, 746 F.

Supp. 493, 499 (D.N.J. 1990) (citing *Lopez v. Swyer*, 300 A.2d 563 (N.J. 1973));

N.J.S.A. § 2A:14-2.

The relevant portions of Detective Garbarino's investigation proceeded as follows. The investigation commenced on September 6, 2013. GCPO Investigation Report, at 1. On September 10, 2013, Garbarino interviewed Schmidheiser and another C/O; on September 19, 2013, Garbarino interviewed McLaughlin; and on March 11, 2014, Garbarino met with Schmidheiser again. *Id.* at 2-4. As part of his investigation, Garbarino spoke with Capanna and Smart. Capanna's first interview took place on July 10, 2014. *Id.* at 18-20. Garbarino received and reviewed the independent audit of Smart's activities as a treasurer. *Id.* at 7-8.

Smart's interview took place on July 15, 2014. *Id.* at 21-23. Capanna's second interview took place on August 8, 2014. *Id.* at 24-25. Plaintiff was arrested on August 22, 2014. *Id.* at 25; Complaint-Warrant. The first civil complaint was filed on August 19, 2016. Doc. No. 26, at 7 (citing to Schmidheiser Mot. to Dismiss, Ex. 1, 8/19/2016 Compl.). Both McLaughlin and Schmidheiser testified in the criminal case on October 2, 2018. *See* Criminal Case N.T. October 2, 2018, at 52-112 (McLaughlin's testimony), 112-189 (Schmidheiser's testimony). The criminal charges resulted in acquittal on October 5, 2018. *See* October 5, 2018 Order. Smart was aware of a possible injury prior to the 2018 testimony, because Smart filed the first civil complaint in 2016.

The Union Officials rely on *Williams* as persuasive authority. *See Williams v. Borough of Highland Park*, 707 F. App'x 72, 76 (3d Cir. 2017). The *Williams* court adopted the relevant statute of limitations from the equitable state law claim but derived the date of accrual from federal law. *Id.* at 75 ("In determining the length of the statute of limitations for a claim arising under § 1983, courts must apply the limitations period

44

applicable to personal-injury torts in the State in which the cause of action arose. . .. The date of accrual of a § 1983 claim is a matter of federal law." (Internal citations omitted)). For § 1983 claims, a claim accrues when "when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action." *Id.* (internal citations omitted). New Jersey uses the same standard when determining when a claim accrues. The Union Officials focus on the Third Circuit's decision that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts becomes most painful.'" *Id.* at 76 (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).

I find *Williams* persuasive, as Smart alleges the discriminatory act occurred when 1) Smart was suspended because of his race and 2) he was subjected to an improper internal affairs investigation. Doc. No. 92-2, at 3. There is no evidence that the Union Officials were involved in these alleged discriminatory acts. The suspension and IA investigation occurred long after Schmidheiser's report to Garbarino, as a result of the intervening criminal charges brought by the prosecutor's office. Schmidheiser's communication to Garbarino occurred in early September 2013. GCPO Investigation Report, at 1. The civil complaint was filed in August 2016, more than two years later.

Plaintiff suggests that the continuing violation theory is appropriate. *See* Doc. No. 92-2, at 17 ("discriminatory and retaliatory acts of Schmidheiser continued after Plaintiff filed his initial complaint. The[y] both showed up to testify against Plaintiff in October 2018.") I disagree. "The underlying purpose of the continuing violation doctrine is to permit a plaintiff to include acts whose character as discriminatory acts was not apparent at the time they occurred." *Stoney v. McAleer*, 11 A.3d 376, 379 (N.J. Super. App. Div. 2010) (quoting *Hall v. St. Joseph's Hosp.*, 777 A.2d 1002 (N.J. Super. App.

Div. 2001); *Cf. Alexander v. Seton Hall University*, 8 A.3d 198 (N.J. 2010)). Smart already recognized the alleged injury prior to 2018.[34] The alleged discriminatory act that the Union Officials had control over occurred in September 2013, more than 2 years prior to the filing of the first complaint in August 2016. For this reason, I grant summary judgment in favor of the Union Officials.

3. *I Grant Summary Judgment for the Union Officials on Count VI: Malicious Prosecution.*

The Union Officials argue Smart failed to show a malicious prosecution claim, because the Union Officials could not initiate the prosecution and, even if the Union Officials could, Garbarino's investigation led to an independent finding of probable cause. Doc. No. 79-2, at 30. Smart responds that a genuine issue of material fact exists regarding malice and probable cause. Doc. No. 92-2, at 14. I find that, as a matter of law, the Union Officials did not initiate the prosecution.

*Malicious Prosecution Standard*

"Malicious prosecution provides a remedy for harm caused by the institution or continuation of a criminal action that is baseless." *LoBiondo v. Schwartz*, 970 A.2d 1007, 1022 (N.J. 2009) (citing *Earl v. Winne*, 101 A.2d 535 (N.J. 1953)). To succeed on malicious prosecution, a plaintiff must prove: "(1) a criminal action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action was terminated

---

[34] The TAD provides that "Defendants discriminated against Plaintiff by causing him to be criminally prosecuted and suspended because of his race in violation of the NJLAD." TAC at ¶ 103. This conduct is different than the conduct Plaintiff relies on in his response. In the response, Smart alleges three discriminatory acts the County engaged in: 1) Smart was suspended because of his race, 2) he did not receive backpay, and 3) he was subjected to an improper internal affairs investigation. Doc. No. 92-2, at 3. The record only contains evidence that Union Officials were involved in the criminal investigation and prosecution. Therefore, I only focus on conduct relating to the criminal charges.

favorably to the plaintiff." *Id.* (citing *Lind v. Schmid*, 337 A.2d 365 (N.J. 1975)). "[E]ach element must be proven, and the absence of any one of these elements is fatal to the successful prosecution of the claim." *Id.* (citing *Klesh v. Coddington*, 684 A.2d 530 (N.J. Super. Law Div.); *Penwag Prop. Co. v. Landau*, 388 A.2d 1265, 1265 (N.J. 1978)). New Jersey courts disfavor malicious prosecution because the courts do not want to deter reporting possible crimes or righting civil injuries. *Penwag*, 388 A.2d at 1226. "On the other hand, one who recklessly institutes criminal proceedings without any reasonable basis should be responsible for such irresponsible action." *Brunson v. Affinity Fed. Credit Union*, 972 A.2d 1112, 1119 (N.J. 2009) (quoting *Lind*, 337 A.2d 365).

   a.   The Union Officials Did Not Initiate the Prosecution as Defined Under New Jersey Law.

The Union Officials argue summary judgment is appropriate, because "it is not plausible that they 'initiated' a criminal action . . . ." Doc. No. 79-2, at 30. Smart neglects to respond to whether the Union Officials initiated the prosecution and instead claims that "[t]here is no dispute that a criminal prosecution was brought against Plaintiff." Doc. No. 92-2, at 14. Smart's assertion misses the point. Smart's argument is also devoid of references to the record or his factual statement.[35] These are reasons enough to grant summary judgment. I will address the merits as well.

---

[35] I refer to portions of Smart's argument to highlight this point. Smart states "[t]he record is also clear that Caldwell aided Schmidheiser and McLaughlin in their plot to maliciously prosecute Plaintiff." Doc. No. 92-2, at 15. Nowhere in the remaining portion of the malicious prosecution section does Smart substantiate Caldwell's assistance or the Union Officials' "plot." *Id.* at 15-16. Next, "[i]n Sergeant Pulliam's Statement, she states that McLaughlin frequently expressed his dislike of Smart in the work place." *Id.* at 15. Smart provides no citation or quotation for this statement in either his brief, Doc. No. 92-2, or in his statement of facts, Doc. No. 92-1.

Next, Smart states that "[the Union Officials] stewed in anger from February to September of 2013. Schmidheiser falsely testified that George Kline, Treasurer of the NJ State FOP, told him to seek prosecution of Smart. Ultimately, Schmidheiser saddled [sic] up to Caldwell. McLaughlin was always game because he hated Smart and Capanna. Caldwell provided friendly access to the Prosecutor's Office." Doc. No. 92-2, at 16. In making these allegations, Smart fails to point me to the false testimony; he fails to

The plaintiff must show that the defendant played "an active part in instigating or encouraging the prosecution." *Falat v. Cnty. of Hunterdon*, No. A-2479-15T1, 2018 WL 3554139, at *8 (N.J. Super. App. Div. July 25, 2018) (quoting *Epperson v. Wal-Mart Stores, Inc.*, 862 A.2d 1156 (N.J. Super. App. Div. 2004)). An active part includes advising or assisting or taking an active part in directing or aiding the conduct of the case. *Id.* (collecting cases).

*Trabal v. Wells Fargo Armored Service Corp.* provides an example of an active role. *See* 269 F.3d 243 (3d. Cir. 2001). Wells Fargo Security Loss Prevention Manager, William Cianci ("Cianci"), initiated an IA investigation regarding a missing money bag. *Id.* at 246. This investigation included taking sworn statements of other employees and reviewing suspects credit histories prior to speaking with police. *Id.* at 246-47. On June 22, 1993, "Cianci summoned Det. Sgt. Mileski of the Lynhurst police to the Wells Fargo facility and both men re-interviewed the employees." *Id.* Cianci then "filed a criminal complaint against [the Plaintiffs]" on June 24, 1993. *Id.* On June 29, 1993, Det. Sgt. Mileski interviewed two additional employees. *Id.* At summary judgment, the district court determined that the parties did not contest if Cianci initiated proceedings; the Third Circuit found this was a proper determination. *Id.* at 248.

The Union Officials also point to *Johnson v. DeBiaso*. *See* No. L-12045-06, 2009 WL 1065994 (N.J. Super. App. Div. 2009). *Johnson* concerned a malicious prosecution claim brought by a former teacher after the school district provided a letter outlining a

---

explain where in the record there is evidence which would allow the inference for "Schmidheiser saddl[ing] up" to the Warden; and what evidence indicates "McLaughlin was always game."

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley*, 455 F.3d at 201 (citations omitted). Yet all that is before me are allegations and conclusory arguments.

possible crime for misuse of insurance, but "did not request that a criminal prosecution be initiated or that any other action be taken by the prosecutor." *Id.* at *2. Upon receipt of the letter, the prosecutor's office initiated their own investigation, a Sergeant of the Prosecutor's Office signed a complaint against the plaintiff, and the Prosecutor's Office presented a grand jury with an indictment. *Id.* The matter went to trial and resulted in an acquittal. *Id.* In the malicious prosecution case, defense filed a motion for summary judgment arguing that the defendants did not initiate the criminal prosecution, rather, the prosecutor's office did. *Id.*

The trial court held that there "is no evidence in which a jury could infer that the school district assisted in the process of presentation to the grand jury, encouraged the prosecutor, participated in the criminal investigation by the prosecutor of the charges." *Id.* at *4 (internal quotations and citations omitted). The appellate court upheld this decision, because the record did not "suggest that defendants did anything more than pass along the information they obtained through their investigation. They did not exert any pressure on the prosecutor to bring criminal charges against plaintiff. Indeed, they did not even request that the prosecutor [bring criminal charges.]" *Id.* at *5. Rather, the appellate court determined that the defendants "remained on the sidelines" through the process, because the prosecutor's office engaged in an independent investigation, made its own determination for probable cause, a law enforcement officer with the prosecutor's office signed the complaint, the prosecutor's office presented the matter to a grand jury, and that grand jury found probable cause. *Id.*

I look at McLaughlin and Schmidheiser's conduct separately. The evidence, in the light most favorable to Smart, does not indicate that McLaughlin played an active role in alerting criminal authorities of possible misappropriation. There is no evidence that

McLaughlin "encouraged" or played "an active part" via advising, assisting, directing, or aiding the criminal prosecution. *Falat*, 2018 WL 3554139, at *8 (quoting *Epperson*, 862 A.2d 1156). McLaughlin reviewed the records under Smart's tenure as Local 97's Treasurer. Smart Dep. at 324:1-325:6; 334:2-335:23. McLaughlin alerted Schmidheiser of his concerns when he did not receive the requested information and provided documentation summarizing his concern. Schmidheiser Dep. at 56:24-60:23. McLaughlin asked Smart for clarification once again. 2/7/12 McLaughlin Letter, at 1. The key difference between McLaughlin's actions and *Trabal*'s facts are that after the FOP's internal audit was completed, it was Schmidheiser, not McLaughlin, who went to the Prosecutor's Office. Schmidheiser Dep. at 177:2-16.

Once the criminal investigation began, McLaughlin provided a statement upon Garbarino's request. GCPO Investigation Report, at 13-16. While the record shows that McLaughlin took steps to internally investigate the matter, McLaughlin's initiative does not flow into initiating the criminal investigation. At most, McLaughlin provided an initial statement at the inception of the criminal investigation in September 2013, then there is no record of any communication with law enforcement until after the arrest in August 2014. I find that there is no evidence in the record that McLaughlin initiated a criminal action against Smart as required for a malicious prosecution claim, because he did not take the information to the detective and Smart has not presented evidence to indicate that McLaughlin supported Schmidheiser going to police.

As for Schmidheiser, the record too fails to establish that he initiated the prosecution. The record shows that Schmidheiser emailed Kline inquiring "[i]f for any reason it is determined there are grounds for criminal charges or an investigation, who would initiate that, the State Lodge, Lodge 97, or will this be a joint venture." 11/23/12

Kline-Schmidheiser Emails, at 3. In response, Kline told him that any criminal complaints should be filed by Local 97. 11/23/12 Kline-Schmidheiser Emails, at 5. Schmidheiser had already decided to report the matter to criminal authorities prior to speaking with Caldwell. Schmidheiser Dep. at 177:2-16. After going to the prosecutor's office, Schmidheiser only spoke with authorities twice during the investigation period and sent one email with information requested by the investigator. GCPO Investigation Report, at 13-16. There is no evidence that Schmidheiser "encouraged" or played "an active part" in the investigation, no evidence that he provided any advice or assistance, and no evidence that he signed a criminal complaint or directed the conduct of the case after going to authorities. *Falat*, 2018 WL 3554139, at *8 (quoting *Epperson*, 862 A.2d 1156); *Johnson*, 2009 WL 1065994. At most Schmidheiser filed the initial report, based on an independent audit, and responded to the investigator's request.

I find that the Union Officials did not "initiate" a prosecution as defined by New Jersey malicious prosecution caselaw. As a result, the first of the four elements required for a malicious prosecution fails. *See LoBiondo*, 970 A.2d at 1022 (citing *Lind*, 337 A.2d 365). "[E]ach element must be proven, and the absence of any one of these elements is fatal to the successful prosecution of the claim." *LoBiondo*, 970 A.2d at 1022. Since the Union Officials did not initiate the prosecution, Smart fails both under the *LoBiondo* case and the requirements for a Plaintiff responding to summary judgment. *Berckeley*, 455 F.3d at 201 (When the party opposing summary judgment is the plaintiff who bears the burden of proof at trial, the plaintiff must "make a showing sufficient to establish the existence of [every] element essential to that party's case."). As my finding that the Union Officials did not initiate the prosecution is sufficient to grant summary judgment, I do not resolve the probable cause question.

I grant summary judgment in favor of the Union Officials.

## B.   I Grant Summary Judgment in Favor of The County Defendants on Counts I, II, III, and IV. I Deny Summary Judgment on Count VI.

The County Defendants move for summary judgment on Counts I, II, III, IV, and VI. *See* Appendix A. This discussion regarding Counts I, II, and VI is governed by the same law as my discussion regarding the Union Officials' arguments. *See supra* pp. 14-52. I briefly note where the corresponding discussion occurred above, rather than duplicate it at length here. For the reasons set forth in the following subsections, I grant the remaining County Defendants' motion for summary judgment, except for Count VII: § 1983 First Amendment Retaliation against Defendant Caldwell. Regarding Count VII, I deny summary judgment without prejudice.

### 1.   *The Briefings Do Not Demonstrate a Material Issue of Fact Regarding Defendant Glaze's Involvement in Any of The Counts Alleged Against Him.*

In their motion for summary judgment, the County Defendants include Defendant Glaze as a defendant requesting relief. *See* Doc. No. 80-1, at 8 ("The Defendants County of Gloucester (the 'County'), Eugene J. Caldwell, II and William Glaze (collectively and hereinafter, the 'County Defendants') respectfully request that the Court grant summary judgment dismissing all the Counts against them."). For Glaze, these counts are Count I, II, and IV. *See* Appendix A. Yet, in his response, Smart neglects to argue Glaze's transgressions. *See* Doc. No. 92-2. The moving party bears the initial burden of identifying those portions of the record that show the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. To defeat summary judgment, the responding party may not simply deny the moving party's showing. *See id.* at 321 n.3; *see also Berckeley*, 455 F.3d at 201 (citations omitted). By responding to

the County Defendants but ignoring Glaze, I Smart's response fails to satisfy the requirements of Rule 56.

After reviewing the record, Glaze's involvement is limited to providing one statement to Garbarino during Smart and Capanna's criminal investigation. GCPO Investigation Report, at 16-17. When Smart was arrested at the jail, Glaze requested Smart relinquish his firearm, then escorted Smart to the waiting law enforcement officers. *See id*. at 25; Smart Dep. at 168:21-171:5. Glaze did not testify in the 2018 trial. *See* Criminal Trial N.T. October 2, 2018, at 2-3; *see* Criminal Trial N.T. October 3, 2018, at 2-3. In his Statement of Facts, Smart submits that C/O Dale Dawson ("Dawson") told Smart that Dawson overheard a conversation between Glaze and C/O Davis. In that overheard conversation, Smart argues that Glaze told Davis that "[i]f Smart weren't found guilty, then Glaze stated that Smart would be subjected to an Internal Affairs investigation, be charged with a 'conduct unbecoming' and terminated from his employment. Smart confirmed Glaze's comments in followup [sic] conversation with Dawson." Doc. No. 92-1 at 12 (the quote is Smart's argument, not a quote of the conversation overheard). This evidence is presented via a certification by Smart with an email from Dawson to Smart attached.

The email from Dawson to Smart states that "Davis was talking to me and said that you're not going to be coming back to work. He said you won't beat this case against you in court and if by some [] miracle you do you still won't be comn [sic] back. He said he was talk [sic] to Glaze and I believe he said [S]harp down at the range and he they [sic] were talkin [sic] about you and if u [sic] beat the case in court they are going to hit you with unbecoming of an officer or some[thing] so that there won't have [sic] a chance

for u [sic] to come back." Exhibit B-2 ("Dawson Email"),[36] at 12. This is improper hearsay evidence as Smart is recounting a statement told to him by Dawson, Dawson is recounting Davis' statement to Dawson, and Davis was recounting a prior conversation with Glaze and Sharp. See *Blackburn*, 179 F.3d at 94-95 (holding inadmissible evidence cannot be relied upon during summary judgment); Fed. R. Evid. 801(a)-(c) (hearsay is inadmissible if introduced for its truth); Fed. R. Evid. 801(d)(2)(a) (a party-opponent statement is admissible); *see also supra* pp. 25-26. Even if Glaze's purported statement were admissible, despite the thicket of hearsay testimony, it does nothing to inculpate him in tortious wrongdoing. At most it demonstrates that Glaze was privy to information about what was coming. Knowing something and doing something are different things altogether. I know the sun will rise tomorrow; that does not prove I am complicit in causing the dawn.

I grant Glaze's motion for summary judgment on Counts I, II, and IV on the basis that Smart has not specified what facts support Glaze's alleged liability in each of the three counts he is a named defendant. I omit Glaze from the remaining analyses in this section.

> ### 2.    *I Grant Summary Judgment in Favor of the County Defendants on Count I: Retaliation in Violation of New Jersey Law, N.J.S.A. § 10:5-12(d).*

In Count I, Smart alleges Defendants Caldwell and County of Gloucester retaliated because Smart engaged in LAD protected conduct. TAC at ¶ 94. The alleged retaliation occurred when Caldwell caused Smart's criminal prosecution and when the County and Caldwell suspended Smart pending the criminal prosecution's resolution.

---

[36] The certification and email were filed as Smart's Exhibit B. Doc. No. 92-5, at 49-60.

*Id.* at ¶ 95. The County Defendants argue Smart failed to demonstrate retaliation, because 1) there are no facts showing a causal connection between Smart's protected acts and the alleged retaliation and 2) Defendants' legitimate, non-retaliatory rationale was not a pretext for retaliation. Doc. No. 80-1, at 4-16. I have previously discussed the relevant standard for LAD retaliation under the N.J.S.A. § 10:5-12(d) in Section A. *See supra* pp. 14-16.

          a.       A Prima Facie Causal Link Is Not Supported by The Record.

A plaintiff must establish an inference of a continuous showing of the circumstantial evidence between the protected act and the retaliation. *See Woodson*, 109 F.3d at 922; *Maslanka*, 2008 WL 918499. The County Defendants argue Smart failed to demonstrate a prima facie causal connection, because the facts demonstrate no causal nexus between Smart's protected acts and the adverse employment action. Doc. No. 80-1, at 5-6. Plaintiff responds that the County was aware of the protected acts because "Plaintiff routinely communicated with the County Administrator, Chad Bruner, and the Freeholders. There [sic] actions after the criminal charges were dismissed to continue the suspension of Plaintiff, subject him to an internal affairs investigation[,] and delay his back pay are crass retaliation . . ." which form material issues of fact. Doc. No. 92-2, at 12. The County Defendants reply that Smart relies only on assertions, not additional evidence, which is insufficient to meet the prima facie burden. Doc. No. 97, at 5-7.

I have set forth how a plaintiff demonstrates prima facie causation. *See supra* pp. 21-23. In brief, a plaintiff can demonstrate prima facie causation via two avenues. A plaintiff can demonstrate "a close temporal relationship between his report and discharge." *Incorvati*, 2010 WL 4807062, at *3 (quoting *LeBoon*, 503 F.3d at 232).

Alternatively, a plaintiff can show "that the proffered evidence, [when] looked at as a whole, raises the inference of causation." *Id.*

Smart's protected acts occurred in April and October 2008, October 2010, June 2011, and November 2011. TAC at ¶¶ 22-25, 35-36, 38, 40-41, 96. The County Defendants' alleged retaliation occurred in March 2013, when Schmidheiser spoke with Caldwell regarding Schmidheiser going to authorities. Doc. No. 92-2, at 11. Another act of alleged retaliation occurred in August 2014, when Smart received Caldwell's letter and the County Human Resources' confirmation of Smart's indefinite employment suspension without pay due to pending criminal charges. Smart Dep. 170:9-21; 8/25/14 Disciplinary Package, at 1. The final alleged act occurred in October 2018, when the County converted Smart's employment suspension to suspension with pay and initiated an internal affairs investigation. 10/17/18 Letter of Undersheriff to Plaintiff, at 1-2.[37]

1.      Temporal Proximity Alone Does Not Indicate Causation.

Courts have held that finding causation via temporal proximity alone is a high burden that requires the adverse action occur "within a few days of the protected activity." *El-Sioufi*, 887 A.2d at 1188 (quoting *Rooks*, 2010 WL 2697304, at *2). Defendants rely on multiple cases[38] holding that the inference of an adverse action is

---

[37] Plaintiff alleges further retaliation because he never received the back pay owed once the charges were dismissed. Doc. No 92-2, at 3. However, the Plaintiff's deposition contradicts the response motion's averment: "Q. Did you receive any other compensation? / A. Back pay. / Q. Did you receive the full back pay that you were entitled to? / A. I believe so." Smart Dep. at 213:24–214:4. Plaintiff cannot rely on assertions in his briefing or pleadings that are in direct contradiction to his deposition testimony. *Baer*, 392 F.3d at 624 (explaining that the "Sham Affidavit Doctrine" does not allow a party to "create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." (citing *Hackman*, 932 F.2d at 241). The issue of withholding backpay as a retaliatory act was not raised in the Third Amended Complaint. *See* TAC at ¶ 95. Plaintiff does request backpay as a remedy but does not raise his failure to receive it as an actionable injury. *Id.*

[38] Cases include *Thomas*, 351 F.3d at 114, 116 (holding that three weeks was too remote); *Thompson*, 2019 WL 2591100, *6 (holding that two months was too remote); and *Tinio*, 2015 WL 1530912, at *8 (holding

appropriate "where two days passed between the protected activity and the alleged retaliation, but not where" many months had passed. *Est. of Smith*, 318 F.3d at 512 (citing *Jalil*, 873 F.2d at 708) (finding appropriate temporal proximity). Here, temporal proximity does not allow a causal inference. The amount of time between the last alleged protected activity and the first claimed retaliation are closer to a year; the time clearly extends beyond the accepted period of mere days. I turn to whether the record contains any other evidence of causation.

> 2.  The Record Contains No Other Evidence Suggesting Causation.

Since temporal proximity alone is insufficient, I review for any other circumstantial evidence that could indicate causation. *Incorvati*, 2010 WL 4807062, at *3 (internal cites omitted). Circumstantial evidence must show that the alleged retaliatory act was "linked" to the protected act, *Krouse*, 126 F.3d at 503-04, and must suggest an "intent to retaliate."[39] *Marasco*, 318 F.3d at 513.

Smart's argument relies on "dislike" to prove the County Defendants' intent to retaliate. Smart argues there is causation, because, starting after Schmidheiser was elected President of Local 97 in June 2012, Schmidheiser had regular meetings with Caldwell,[40] and Caldwell did not aid Plaintiff during the criminal prosecution but instead "kept tabs on the investigation. . . so that it did not stall." Doc. No. 92-2, at 11. Smart argues there is a material issue of fact because "[a] jury would reasonably conclude that Caldwell set the table for [the Union Officials] to make their false

---

that 22 months was too remote). The County Defendants lists six additional cases with the holding that time frames from nine months to five years were too remote. *See* Doc. No. 80-1, at 7.

[39] I have previously discussed how a plaintiff can discuss other circumstantial evidence of a causal connection. *See supra* pp. 23-29.

[40] The briefing's language is "meetings with Schmidheiser." Doc. No. 92-2, at 11. Context shows that this, likely, should read as "meetings with Caldwell."

allegations of criminal conduct against Plaintiff to the Prosecutor."[41] *Id.* To survive summary judgment, Smart must demonstrate that there was a causal link between the protected act and the alleged retaliation. *See Woodson*, 109 F.3d at 922. None of the evidence Smart presents link the acts or demonstrate an "intent to retaliate." *Marasco*, 318 F.3d at 513.

In his Statement of Facts, Smart mentions two possible acts of antagonistic conduct by the County. *See e.g., Incorvati*, 2010 WL 480762, *4 (finding antagonistic conduct included lowering job support and transferring job duties away). However, these acts were omitted from Smart's response. *See* Doc. No. 92-2, at 11-12. I had to dig for this truffle. The first act occurred in 2011 when "Plaintiff was disciplined for not wearing a vest" as required, but his then-partner was not written up for the same infraction. Doc. No. 92-1, at ¶ 12 (citing N.T. Smart, p. 121). The second act is Smart's speculation that "Plaintiff was targeted by being [moved] from his normal assignment and assigned to perform inmate strip searches." *Id*. at ¶ 16 (citing N.T. Smart, p. 146). Plaintiff considered this the least desirable duty. *Id*. For antagonistic conduct to lead to an inference of causation, the conduct need be continuous. *See Woodson*, 109 F.3d at 922. Smart does not provide a specific timeline for when he was transferred to the inmate search assignment. Without information about when Smart was in this less desirable duty, I cannot link the reassignment and the write up to a retaliatory intent. *See e.g., Watkins*, 224 F. Supp. 2d at 872-73 (discussing causation for antagonistic conduct where the plaintiff was required to take on additional tasks or was set up for failure). It is possible the reassignment occurred before, during, or after the protected

---

[41] Plaintiff also argues the County was aware of the protected complaints, because Smart routinely spoke with Bruner and the Freeholders. Doc. No. 92-2, at 12. This merely shows knowledge, the first prong of the three prong-test that a jury would be confronted with, not causation.

acts occurred. Relying on these two acts alone would be insufficient for a finding of causation.

The remaining evidence Smart presents cannot be determined to be antagonistic conduct. Smart argues that Schmidheiser and Caldwell met, Caldwell sent emails to the investigator, Caldwell did not come to Smart's aid during the criminal investigation, and the County Defendants did not like him.

Schmidheiser and Caldwell's meetings do not show any intent to retaliate against Smart. As discussed previously, the alleged conduct needs to be directed at the plaintiff. *See supra* pp. 27-28 (discussing *Ahmed*, 2012 WL 3038523, *13; *Maslanka*, 2008 WL 918499, *23; *Watkins*, 224 F. Supp. 2d at 872-73; *Incorvati*, 2010 WL 480762, at *1, *4). The record contains no indication that Schmidheiser and Caldwell's meetings included Smart, let alone that the meetings were even about Smart.

Plaintiff argues that the "County instructed Caldwell to keep tabs on the investigation so that it **did not stall**." Doc. No 92-2, at 5 (emphasis in original) (citing to Doc. No. 92-6, Exhibit R ("Caldwell Dep.")). Caldwell's deposition states that these emails were "just a regular routine checkup just to make sure that the investigation was continuing so it didn't stall. So[,] we would check maybe every 30 days, 45 days. I don't [know] exactly when. But we were instructed by County counsel to keep checking up on a regular basis." *Id*. at 108:20-25. When asked if he had concerns if the investigation would stall, Defendant Caldwell stated he did not and that the emails were "[j]ust to make sure it keeps on going. I mean, stalled may have been the wrong word. But just to make sure it keeps going. Just an update. That's what we were instructed to do." *Id*. at 109:1-6. As with the meetings between Schmidheiser and Caldwell, this conduct is not directed at Smart. I also fail to see how a jury could reasonably infer an intent to

retaliate from an employee following the County Attorney's instructions to ask for routine updates on a criminal investigation of a County employee. The last protected act occurred in November 2011. The criminal investigation initiated in March 2013 and resulted in an arrest in August 2014. These emails fail to establish a continued intent to retaliate between the last instance of protected conduct, in November 2011, and the first alleged act of retaliation in March 2013.

Smart argues (1) Caldwell did not come to his defense when Smart was criminally investigated between September 2013 and August 2014 and (2) that "a review of the record demonstrates a substantial dislike McLaughlin, Schmidheiser, and Caldwell had for Plaintiff." Doc. No. 92-2, at 10-12. Caldwell failing to come to Smart's aid is not evidence of a retaliatory animus; it is inaction. Caldwell was consistent in explaining that Schmidheiser's decision to go to law enforcement authorities was a "union matter." *See* Caldwell Dep., at 136:15-137:6. Therefore, his lack of aid does not demonstrate that inconsistent reasons were provided for his involvement in the alleged retaliation. *See Incorvati*, 2010 WL 4807062, at *3 (citing *Marra*, 497 F.3d at 302; *Treaster*, 2010 WL 2606479, at *21) (holding inconsistent reasons proffered by the employer is circumstantial evidence that establishes a basis for the inference of causation).

The remaining evidence Smart presents cannot be determined to be antagonistic conduct—that Schmidheiser and Caldwell met, Caldwell sent emails to the investigator, Caldwell did not come to Smart's aid, and Caldwell did not like Smart. The first is not directed towards Smart and there is no evidence Smart was a topic of the conversations, the second was done under the directive of County Counsel, the third is not antagonistic conduct, but mere inaction, and the fourth is not an actionable animus.

Smart argues his continued leave of employment after acquittal in 2018, the 2018 IA investigation, and his delayed back pay "are crass retaliation." Doc. No. 92-2, at 12. Smart's response brief does not refer to any evidence that the act of initiating the 2018 IA investigation was retaliation for the protected activities. The record clearly and consistently indicates that, per policy, an employee facing criminal prosecution would be on leave without pay; if the criminal prosecution concluded with dismissal, then the employee would be made whole with appropriate backpay; and an IA investigation would not be initiated until the criminal case concluded. *See e.g.*, Doc. No. 79-5, Exhibit R ("Schneider Dep."), at 23:23-25:7; Bruner Dep. at 30:19-35:14, 48:22-49:11; Caldwell Dep. at 103:6-11, 105:14-16.

The record does not demonstrate how the act of opening an IA investigation or delaying backpay can be accredited to Defendant Caldwell. *See* 10/17/18 Knestaut Letter to Smart, at 2. In this letter, Knestnut, the Undersheriff, writes that "[a]ny back pay, back pension contributions, or other such financial matters regarding or relating to the time period from September 2, 2014, and October 5, 2018 (time of suspension without pay), will have to await completion of the IA, as well as any other civil or other matters that may be pending, or filed." *Id.* However, Smart omits relevant information in the first paragraph. That paragraph explains that

> you must first be advised that as of May 17, 2017, the Sheriff took over as the 'Appointing Authority' for and regarding the Gloucester County Department of Correctional Services (hereinafter the "DOC"). As such, it was the Sheriff, and not the County Freeholders/Administration, that is responsible for all DOC personnel matters, including, but not limited to, hiring, promotions, terminations, and discipline.

*Id.* at 1. Caldwell was not employed by the Sheriff's Office. Smart acknowledges in his deposition that the chain of command within the Department of Corrections starts with

a corrections officer, who reports to a sergeant, who reports to a lieutenant, then a deputy warden, then the warden. Smart Dep. at 33-34. The warden reports to the County Administrator. *Id*. Plaintiff does not direct me to any evidence that indicates Caldwell had any connection or influence over the making of administrative decisions regarding an employee's employment or pay status after the Sheriff's Office took control of those decisions in May 2017.

Furthermore, Plaintiff provides no argument or evidence that the County, via the Sheriff's Office, possessed a retaliatory animus for known protected activities. The record must allow an inference of an "intent to retaliate" connecting the protected act and the retaliation in 2018. *Marasco*, 318 F.3d at 513; s*ee Woodson*, 109 F.3d at 922. At summary judgment, I must draw all reasonable inferences in favor of Smart. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994). However, to make the inference that Smart is asking for—that the County, through the Sheriff's Office, delayed backpay and began an IA investigation to retaliate for the 2008 through 2011 protected activities—I must make a series of four inferences.

The first inference I must make is that the Sheriff's Office was aware of Smart's protected activities—closed complaints that occurred almost a decade prior. There is no evidence in the record supporting this inference, and Smart does not point to any. Instead, he simply argues that the County Administration knew. Doc. No. 92-2, at 12. It would be reasonable to infer that the Sheriff's Office would be told of pending complaints that constitute protected acts, but Smart's complaints were not pending in 2017, when the Sheriff's Office took control of personnel matters. These complaints had been closed for years. The next inference is that the Sheriff's Office also disliked Smart. Once more, Smart fails to provide any evidence in the record to support this inference.

Then, I must infer that the Undersheriff and the Sheriff's Office did not like Smart because of the protected acts. Finally, I must infer that the dislike was the motivation for delaying the back pay. This string of inference upon inference is too attenuated to be reasonable. None of the inferences are supported by evidence identified by Smart.

Plaintiff has not borne his burden to show facts that would support a prima facie inference that putting Smart on leave without pay while a criminal prosecution was pending and not beginning the IA investigation until after the prosecution concluded, were acts of retaliation as opposed to following administrative procedure. I find that Plaintiff has not identified a material issue of fact which, if viewed in the light most favorable to Smart, would allow a reasonable jury to infer causation between the protected acts and the alleged retaliation. I will grant summary judgment on Count I in favor of the County Defendants.

    b.  Plaintiff Has Not Shown the County Defendants' Alleged Legitimate, Non-Retaliatory Rationale Was a Pretext for a Retaliatory Animus.

Plaintiff has not shown prima facie causation in Count I against the County Defendants. The County Defendants argue that their alleged legitimate, non-retaliatory reasons were not a pretext for retaliation. Doc. No. 79-2, at 12. Plaintiff argues that the County Defendants have not explained why the County delayed paying Smart's his backpay; and Plaintiff argues that the criminal charges were not legitimate, and, therefore, not a legitimate basis for his suspended employment.[42] Doc. No. 92-2, at 9.

---

[42] Plaintiff does not respond to the pretext argument as it concerns Count I; instead, he argues it concerning Count II: LAD Racial Discrimination. Doc. No. 92-2, at 9-10. As discussed previously, the analysis for LAD pretext is the same for both Racial Discrimination and Retaliation; therefore, I review the response under Count I. *See supra* pp. 30-31.

At summary judgment, the plaintiff must show a genuine issue of fact regarding motive. *Romano*, 665 A.2d 1139, 1143–44 (citing *St. Mary's Honor Ctr.*, 509 U.S. 502). The plaintiff must present evidence that would prompt a reasonable factfinder to either 1) disbelieve the proffered reasons, or 2) "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 1143–44 (quoting *Fuentes,* 32 F.3d 759).

The County Defendants argue that a plaintiff's argument for pretext fails if the plaintiff demonstrates that the reason was false but does not demonstrate a discriminatory intent. Doc. No. 80-1, at 9, 15 (citing *Viscik v. Fowler Equip. Co.*, 800 A.2d 826, 833 (N.J. 2002); *Zive*, 867 A.2d at 1141). Defendants also argue that pretext cannot be established by a plaintiff merely showing that an employer's investigation resulted in the wrong decision. Doc. No. 80-1, at 15 (citing *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 152-154 (3rd Cir. 2017)). To support their position, Defendants cite *Capps*, where the Third Circuit affirmed summary judgment in favor of the employer. 847 F.3d 144 (deciding an FMLA retaliation claim via the *McDonnell Douglas* pretext analysis). *Capps* held that there cannot be a finding of pretext if the record indicates that the employer held an honest belief that there was misuse of FMLA leave, whether or not the decision was correct. *Id.* at 152-54 (reviewing sister circuit analyses on various FMLA retaliation claims where courts have used this "honest belief" analysis). The County Defendants argue that the honest belief analysis is appropriate here.

Plaintiff responds that "Defendants fail to identify any legitimate reason as to why it refused to pay Plaintiff's back pay and continue his suspension pending an Internal Affairs investigation after the charges were dismissed. . . [and] the fact that the County supported and relied upon trumped up and false accusations to sustain charges,

also constitute a pretext."[43] Doc. No. 92-2, at 9-10. In supporting this conclusory argument, Plaintiff curiously cites *Fuentes*. Pl. Br. at 9 (citing 32 F.3d at 765). There, the Third Circuit found that Plaintiff failed to provide sufficient evidence of the pretextual discriminatory intent. *Fuentes*, 32 F.3d at 765. Perskie, the head of the employer's hiring commission, decided not to hire Fuentes for a list of reasons (lacking leadership skills, management skills, developed interpersonal skills; and engaging in unprofessional conduct), none of which were because Fuentes was unqualified. *Id*. at 765-66. The Court upheld the District Court's decision, because the decision to hire the other applicant was supported by evidence that the other applicant was more qualified than Fuentes and the restaffing did not "throw real doubt on the employer's proffered legitimate reason." *Id*. at 766.

Fuentes made a litany of arguments to show pretext, all of which were rejected. *Id*. at 766-67. Plaintiff's reliance on *Fuentes* is fatal to his argument. *Fuentes* provides an example of how, even when a Plaintiff provides arguments that rely on evidence, the evidence can remain insufficient to support the Plaintiff's position.

Here, Plaintiff presents assertions without presenting an evidentiary narrative to explain how a reasonable jury could infer that discriminatory intent motivated the County Defendants' decisions. "[T]he nonmovant must . . . respond [to a summary judgment motion] by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden

---

[43] "The non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley*, 455 F.3d at 201 (citations omitted). Yet again, Plaintiff makes broad assertions without arguing where the record reflects these assertions. For example, Smart argues that "Defendant disregard[ed] the fact that the allegations were not entitled to any credence, were false and concoctes [sic]." Doc. No. 92-2, at 9. Plaintiff relies on no evidence to explain how the County was aware that the criminal allegations, brought by the Prosecutor's Office (a separate entity) were false and concocted.

of proof at trial." *Id.* at 762 (citing *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536, n. 3 (3d Cir.1994)).

The County Defendants present a clear evidentiary narrative with citations to the record or their statement of facts. *See* Doc. No. 80-1, at 14 (citing to County Defendant SMF No. 67). Plaintiff, on the other hand, argues the County Defendants proffered legitimate reason is pretextual because 1) Defendants provided no reason why they denied Plaintiff his backpay; 2) Defendants provided no reason why they continued his suspension pending an IA investigation; and 3) the County "supported and relied upon trumped up and false accusations to sustain charges, also constitute a pretext." Doc. No. 92-2, at 9-10. These claims are not supported by cognizable evidence which suffices to create a material issue of fact. The record indicates that the County was following established procedure for a corrections officer facing criminal charges.

Regarding Smart's first and second argument, the issue of withheld backpay was not raised in the Third Amended Complaint as an act of retaliation, but rather as a form of damages. *Compare* TAC at ¶ 95 ("By and through its course of conduct as alleged herin, [sic] Defendants retaliated against Plaintiff by attempting to remove him from union leadership and causing him to be criminally prosecuted and suspended for a supposed violation that Defendants knew was baseless.") *with* TAC at ¶ 106 ("As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer severe harm, and is entitled to all legal and equitable remedies available under the NJLAD, include, but not limited to, back pay. . ..).

Additionally, the record provides a consistent reason why Defendants continued Smart's suspension pending an IA investigation—to have conducted the IA investigation contemporaneously with the criminal investigation would be counterproductive. *See*

*e.g.,* Caldwell Dep., at 103:6-11. The Plaintiff must point to some evidence that would allow a factfinder to reasonably conclude that the Plaintiff should have returned to work immediately once the criminal trial was dismissed. The lack of evidence does not permit a reasonable jury to reach such a conclusion.

I find the Plaintiff has not produced evidence that the County Defendants' proffered reasons were a pretext for retaliatory intent; therefore, I find for summary judgment in favor of the County Defendants in Count I.

> 2.    *I Grant Summary Judgment on Count II: NJLAD Racial Discrimination in Favor of the County Defendants.*

Smart alleges Caldwell and the County engaged in racially discriminatory conduct. TAC at ¶ 103. The alleged discrimination occurred when the defendants caused Smart "to be criminally prosecuted and suspended because of his race. . .." *Id.* The County Defendants argue summary judgment is appropriate because there is no direct evidence or circumstantial evidence of discrimination. Doc. No. 80-1, at 16-18. Smart responds there is a showing of differential treatment based on plaintiff's race; and there is pretext, because "Defendants fail to identify any legitimate reason as to why it refused to pay Plaintiff's back pay and continued his suspension pending an [IA investigation] after the charges were dismissed." Doc. No. 92-2, at 5-10. I have already set forth the legal standard for reviewing LAD racial discrimination claims. *See supra* p. 37.

> a.    There is No Direct or Circumstantial Evidence that the County Defendants Engaged in Racial Discrimination.

The County Defendants submit there is no evidence of any direct or circumstantial racial discrimination. Doc. No. 80-1, at 16-17. Smart responds there is circumstantial evidence of racial discrimination due to differential treatment based on plaintiff's race. Doc. No. 92-2, at 5-10. Smart's argument falls under the fourth prong of

how racial discrimination can occur in an employment setting: "the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination." *See Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).

         1.     There is No Direct Evidence of Racial Discrimination.

I only briefly address if there is any direct evidence of racial discrimination because Smart does not respond to this argument.[44] "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact in issue without inference or presumption." *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (punctuation omitted) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). Direct evidence renders the *McDonnell Douglas* analysis inapplicable. *Id.* at n.3 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3d Cir. 1987)).

The County Defendants argue that "Smart makes no allegation that anyone from the County, including any of the individual defendants, ever made any remarks to him about his race of any kind, let alone any racial remark that overtly or explicitly constitutes evidence that directly reflected a discriminatory bias against him." Doc. No. 80-1, at 17. The County Defendants further argue that even if there were any direct evidence, Smart has not made out how the direct evidence causally related to the

---

[44] That is reason enough to enter summary judgment. *See Celotex*, 477 U.S. at 322 (summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial"). "There is no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable fact finder could return a verdict in that party's favor." *Knappe & Koester, Inc.*, 1990 WL 49814, at *2 (citing *Anderson*, 477 U.S. at 249.).

adverse employment determinations. *Id*. Without direct response from the Plaintiff, I agree that the record contains no direct evidence of racial discrimination.

> 2.   There is No Circumstantial Evidence of Racial Discrimination.

The County Defendants argue 1) there is no pretext evidence of discriminatory intent and 2) the prosecution was initiated by the Prosecutors' Office, an entity that is operated independently from the County, so it is impossible to place any intent on the County in the capacity Smart desires.[45] Doc. No. 80-1, at 17-18. Smart responds that there are four instances of race-based differential treatment that indicate the County's racial discrimination.[46] Doc. No. 92-2, at 5-9. These instances are that 1) Capanna was not subjected to an IA investigation after prosecutors chose to not criminally prosecute him; 2) C/Os with prior convictions received preferential treatment; 3) Caldwell received preferential treatment during his IA investigation; and 4) the County

---

[45] I agree with the County Defendants that the decision to prosecute, for the purposes of the LAD claims, was out of their control. *See, e.g.*, *State v. Saavedra*, 81 A.3d 693, 707 (N.J. Super. App. Div. 2013) ("At the outset, we note that whether to charge an individual suspected of criminal offenses is within the prosecutor's discretion. . .. Beyond purely constitutional concerns, the judiciary generally defers to the prosecuting attorney's discretion to charge or not to charge because enforcement decisions are the product of prosecutorial value judgments and expertise, and because courts lack standards by which to review these decisions. (citation and internal quotation marks omitted)). I also note that New Jersey Courts "generally defer[] to the prosecuting attorney's discretion to charge or not to charge because enforcement decisions are the product of prosecutorial value judgments and expertise, and [because] courts lack standards by which to review these decisions." *Id*. (quoting *State v. Di Frisco*, 571 A.2d 914, 921 (N.J. 1990)).

Smart was subjected to leave without pay pending the resolution of the prosecution and an IA investigation after the conclusion of the prosecution. This conduct was within the control of the County of Gloucester.

[46] Plaintiff provides an in-depth analysis regarding the credibility of Defendant Caldwell's deposition. Doc. No. 92-2, at 3-5. Plaintiff requests "Caldwell's testimony be disregarded as not credible" and disregard alleged "crimen falsi" evidence in this analysis. *Id*. at 4. Credibility determinations and evidentiary weighing is not appropriate at the summary judgment phase but must be reserved for the fact finder. *Anderson*, 477 U.S. at 255. Plaintiff is aware of this standard, as in his response to the FOP Defendants' motion, he requests I disregard requests "to make credibility determinations and to weigh the evidence against the nonmoving party, which is improper." Doc. No. 95-1, at 5-6.

systemically enforced policies against African American C/Os at a higher rate than against Caucasian C/Os. Doc. No. 92-2, at 5-9.

Evidence is not direct when it requires the factfinder to form an inference. *Torre*, 42 F.3d at 829 (citing *Perry v. Prudential–Bache Securities, Inc.*, 738 F. Supp. 843, 851 (D.N.J. 1989)). To show that the County systemically enforced policies unequally, and establish prima facie racial discrimination, a plaintiff can follow one of two avenues: 1) "introduce evidence of comparators"[47] or 2) "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Greene*, 557 F. App'x at 195 (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797, n. 7 (3d Cir. 2003)).

I look to *Greene* for guidance. *See* 557 F. App'x, at 195-96 (reviewing *Greene v. Virgin Islands Water & Power Auth.*, No. 06-cv-00011, 2013 WL 2279350, at *1 (D.V.I. May 22, 2013) (Jones, J.)). The Third Circuit upheld the District Court's determination that the two individuals Greene compared himself to were not similarly situated. *Greene*, 557 F. App'x at 195. The key flaw in Greene's argument was that he "otherwise failed to produce evidence that could give rise to an inference of discrimination because the evidence that he produced could not establish a causal nexus between the termination of his employment and his membership in a protected class." *Id.* at 196. Greene presented evidence that the employer engaged in "improper bidding procedures for Puerto Rican vendors," "paid for the Inspector General's investigation [against Greene]," and Greene's "successor [was] married to a Hispanic woman." *Greene*, 2013 WL 2279350, at *3. The District Court found that Greene was arguing "an 'everything

---

[47] Comparators are "similarly situated employees" who are not members of a plaintiff's protected class and who "received more favorable treatment under similar circumstances." *Greene*, 557 F. App'x at 195 (citing *Sarullo*, 352 F.3d at 797, n. 7).

but the kitchen sink' approach to raise this inference." *Id.* The Third Circuit agreed that "[e]ven in sum, and considered in the light most favorable to him, such evidence does not a causal nexus make." *Id.* (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) ("[T]he party opposing summary judgment . . . must point to evidence . . . that creates a genuine dispute of material fact, 'and may not rely simply on the assertion that a reasonable jury could discredit the opponent['s] account.'")).

I find that Smart is attempting the same kitchen sink approach here. His argument is an effort to discredit the opponents' account, rather than showing clear causation between his being a member of a protected class and the adverse employment actions he suffered. Smart presents a three-page argument about Schmidheiser's, McLaughlin's, and Caldwell's credibility, Doc. No. 92-2, at 3-5, and continues to present the same credibility argument through portions of his circumstantial evidence argument. *Id.* at 9 (regarding the County aggressively enforcing policies, Smart argues that "[Caldwell's] testimony is simply not credible.").

Further, Smart alleges "discrimination based on substantial comparator evidence." *Id.* However, the evidence presented, "[e]ven in sum, and considered in the light most favorable to him, . . . not a causal nexus make." *Greene*, 557 F. App'x at 196. The officers with prior convictions were not similarly situated to Smart: Merckx had the conviction *prior* to being hired by the County, and McLaughlin was provided an accommodation that would allow him to continue to work *after* the conviction, not during. Doc. No. 92-2, at 7. Smart presents no evidence regarding McLaughlin's treatment during McLaughlin's pending prosecution. Instead, Smart argues that "[a]t no time was Smart offered a deal where he could plea to a minor offense, keep his job[,] and get back pay." *Id.* The decision to formally charge a criminal offense was made by

71

the Prosecutor, not Smart's employer, and all plea offers are within the realm of the prosecuting attorney's decision-making. The fact Smart was never presented a plea offer acceptable to him during the prosecution's four years is not causally linked to racial discrimination by his employer.

Regarding Smart's argument that the Defendants aggressively enforced policies against African Americans and treated Caucasian officers with favoritism, *Id*. at 9, this argument does not reflect disparate treatment of comparators. Similarly situated requires more than merely being a member of the same protected class and employed by the same employer. *Greene*, 557 F. App'x at 196. *Greene* highlights that "the evidence, viewed in the light most favorable to Greene, shows that Greene was suspected of diverting WAPA resources, whereas Belardo and Mercado merely supervised employees who were suspected of diverting or stealing WAPA resources." *Id*. The Court found that these employees were not comparable, "[b]ecause Belardo and Mercado were not accused or suspected of the same wrongdoing as Greene, they were not similarly situated to him and were not valid comparators." *Id*.

While both Capanna and Smart were investigated by the prosecutor's office, the similarities end there. Capanna was never formally charged after the investigation; Smart was investigated, charged, tried, and acquitted. Smart acknowledges this distinction in his argument when he specifically states that "none of them were subjected to a four year prosecution and suspension without pay." Doc. No. 92-2, at 10. *Greene* makes it clear that Capanna is not an appropriate comparator.

Smart fails to establish viable comparators. I grant the County Defendants' summary judgment on Count I.

b.      There is No Evidence That the County Defendants' Proffered
Reasons Were a Pretext for Racial Discrimination.

Smart also argues that there is pretext, because "Defendants fail to identify any
legitimate reason as to why it refused to pay Plaintiff's back pay and continued his
suspension pending an internal affairs [investigation] after the charges were dismissed."
Doc. No. 92-2, at 10. For the pretext analysis to apply a prima facie showing of
discrimination must have been made. *See Greene*, 557 F. App'x at 201, n.8 ("Because we
conclude that Green did not establish a prima facie case of employment discrimination,
we need not address his arguments that concern pretext."). Even though Smart has not
made out the fourth prong required for prima facie racial discrimination, under *Greene*,
I will briefly review his pretext argument.

Plaintiff argues that Defendants' proffered legitimate reasons are pretextual
because 1) Defendants provided no reason why they denied Plaintiff his backpay; 2)
Defendants provided no reason why they continued his suspension pending an IA
investigation; and 3) the County "supported and relied upon trumped up and false
accusations to sustain charges, also constitute a pretext." Doc. No. 92-2, at 9-10. I have
previously walked through these arguments. *See supra* pp. 66-67. I reiterate, Smart's
pretext argument does not point to evidence that would allow a reasonable factfinder to
determine that the County's treatment of Smart was predicated upon racial
discrimination and that the County Defendant's explanations were intended to obscure
the discrimination. I find Plaintiff has not shown that the County Defendants' proffered
legitimate reasons were a mere pretext for discriminatory intent.

### 3.   *I Grant Summary Judgment in Favor of the County of Gloucester on Count III: § 1981 Race Discrimination and Retaliation.*

The County of Gloucester argues that the § 1981 claim should be analyzed under the same *McDonnell Douglas* parameters as the corresponding LAD claims. Doc. No. 80-1, at 18-19. However, Plaintiff argues that to bring a § 1981 claim "against a municipality, the Plaintiff must show that the municipality was acting pursuant to a specific policy or custom." Doc. No. 92-2, at 12 (quoting *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997) (discussing a § 1983 claim against a municipality)).

Smart cites the appropriate standard. The standard diverges from the LAD analysis by requiring a determination that the County was acting pursuant to an official policy or custom. "Government entities are generally not liable under § 1981 unless injury results from the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Chong v. City of Hoboken*, No. 21-cv-15825, 2022 WL 3357899, at *5 (D.N.J. Aug. 15, 2022) (quoting *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978)). "The United States Supreme Court has held that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id.* (quoting *Oaks v. City of Philadelphia*, No. 02-2772, 2003 WL 1228025, *1 (3d Cir. Mar. 17, 2003) (quoting *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989))). "Thus to prevail on his claim for damages against government entity, a claimant must show that the violation of his 'right to make

74

contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Id.* (quoting *Jett*, 491 U.S. at 702, 735).

Section 1981 claims, like § 1983 claims, require a showing that the municipality acted "pursuant to official municipal policy" or custom that "caused a constitutional tort." *Monell*, 436 U.S. at 691; *see also Fletcher v. O'Donnel*, 867 F.2d 791, 793 (3d Cir. 1989) ("A city may be held liable for an official policy or a custom which proximately causes a constitutional deprivation"). A municipality cannot be held liable under a theory of *respondeat superior*. *Id.* at 691. Municipal policy forms when the employee or employees "responsible for establishing final policy" make "a deliberate choice to follow a course of action." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). A single action can constitute a policy only when the action is made "by a governmental agency's highest policy maker," but not when a "lower-level employee act[s] under color of law." *Fletcher*, 867 F.2d at 793. A custom is formed when "the relevant practice is so widespread as to have the force of law," *Brown*, 520 U.S. at 404, and "can be established by proof of knowledge and acquiescence." *Fletcher*, 867 F.2d at 793 (internal cites omitted).

Smart argues that the record indicates a custom that permits "racially discriminatory treatment against African American and Caucasian officers." Doc. No. 92-2, at 12. As an example, Smart provides

> the County was aware and acquiesced in the favorable treatment to McLaughlin, Merckx[,] and Capanna as set forth above. The record shows that African American employees who are alleged to violate policies and/or are falsely accused of violating policies have been subjected to unfair and disproportionate discipline. For sure, they were not given the custom of favorable treatment [based simply on their race or ethnicity].

*Id.* at 13.[48]

Smart argues a custom stemming from deliberate indifference of the policymakers, as none of the above examples include the alleged tortfeasors acting in accord with an affirmative policy. *See Natale v. Camden County Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (describing three ways for a municipality to form a custom: 1) the presence of an affirmative policy, 2) no policy, but the policymaker performs a single act violating the individual's civil rights, or 3) the policy-maker's deliberate indifference to the employees' rights violating conduct.). The inference Smart asks for is that there was a general custom in force to favor Caucasian employees over African American employees when making disciplinary decisions.[49]

Smart's argument fails because he must show that the custom was the proximate cause of any injuries suffered, which is done via a showing of a "plausible nexus" or "affirmative link." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) ("However, proof of the mere existence of an unlawful policy or custom is not enough to maintain a § 1981 action. A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered." (Citing *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984)). Plaintiff has failed to appropriately show the requisite causation. *See supra* pp. 69-73. I grant summary judgment in favor of the County of Gloucester on Count III.

---

[48] Once more, Plaintiff does not provide any citations to the record or his statement of facts. This is fatal to his claims. *Berckeley*, 455 F.3d at 201.

[49] Smart need not define a policymaker for the purposes of a custom argument. *Hailey v. City of Camden*, 631 F. Supp. 2d 528, 541 (D.N.J. 2009) ("Where a plaintiff seeks to hold a municipality liable for a particular policy, the court is obligated to identify the policymaker for the jury. . .. The analysis is somewhat different, however, where the plaintiff is able to establish a custom. In that circumstance, the responsible decision-maker need not be specifically identified by the plaintiff's evidence." (internal citations omitted)). As Smart's language includes both "policy and custom," his arguments fail regarding any asserted policy, as he does not assert the respective policymaker.

4.     *I Grant Summary Judgment in Favor of Caldwell on Count IV: §*
       *1981 Race Discrimination and Retaliation.*

Defendant Caldwell and Plaintiff submit that the § 1981 standard is the same as

the LAD standards (Counts I and II) for individually named defendants. Doc. No. 80-1,

at 18-19 (quoting *Kant v. Seton Hall Univ.*, 289 F. App'x 564 (3rd Cir. 2008) (outlining

that § 1981, Title VII and NJLAD discrimination claims were appropriately analyzed

under the *McDonnell Douglas* burden-shifting framework)); Doc. No. 92-2, at 13

(quoting *Wesley v. Palace Rehab. & Care Ctr., LLC*, 3 F. Supp. 3d 221, 230 (D.N.J.

2014) (determining that "[c]laims brought under § 1981 and the NJLAD are analyzed

using the same evidentiary schemes.")). For the reasons explained above, *see supra* pp.

54-73, I grant summary judgment on the § 1981 Race Discrimination and Retaliation

claims (Count III) against Caldwell.

5.     *I Grant Summary Judgment for the County Defendants on Count*
       *VI: Malicious Prosecution.*

The County Defendants argue Smart failed to make out a malicious prosecution

claim, because none of these defendants could initiate the prosecution and there was an

independent investigation and finding of probable cause. Doc. No. 80-1, at 23. Smart

responds that there is a genuine issue of material fact regarding if there was malice and

if there was probable cause. Doc. No. 92-2, at 14. I previously set forth the legal

standards for malicious prosecution. *See supra* pp. 46-47. I find that, as a matter of law,

the County Defendants did not initiate the prosecution.

a.     The County Defendants Did Not Initiate the Prosecution as
       Defined Under New Jersey Law.

Plaintiff has not presented any evidence that would allow a reasonable jury to

infer that these defendants initiated the criminal action. *See LoBiondo*, 970 A.2d at 1022

(holding each element must be shown). In his argument, Smart asserts that "[t]here is no dispute that a criminal prosecution was brought against Plaintiff" and focused on other required elements of a malicious prosecution claim. Doc. No. 92-2, at 14. Additionally, Smart's argument, albeit focused on probable cause and maliciousness, is devoid of references to the record or his factual statement.[50]

I rely on the same analysis I used regarding the Union Officials' motion in determining that the record does not demonstrate that the County Defendants engaged themselves as an advisor or other such role during the investigation. *See supra* pp. 46-52. That County's role in the prosecution was even more attenuated than the Union Officials'. The only connection that the County Defendants have to the initiation of the prosecution is that Caldwell 1) offered to facilitate the communication between Schmidheiser and the Prosecutor's Office and 2) asked for routine updates upon the prompting of the County's counsel. Caldwell's conduct does not rise to the requisite level for the initiation of a malicious prosecution. *Falat*, 2018 WL 3554139, at *8 (quoting *Epperson*, 862 A.2d 1156). None of the proffered communications indicate that these defendants played "an active part in instigating or encouraging the prosecution," by advising, assisting, taking an active part in directing or aiding the conduct of the case. *Falat*, 2018 WL 3554139, at *8. I hold that there is no genuine issue of material fact from which a jury could reasonably infer that the County Defendants initiated the criminal prosecution.

---

[50] I have previously expanded upon this point. *See supra* note 35.

> 6.    *I Deny Summary Judgment on Count VII: § 1983 First*
>       *Amendment Retaliation Against Defendant Caldwell.*

Defendant Caldwell argues that Count VII must fail because "the complaint fails to allege that Caldwell knew Smart was engaging in protected acts, and there is no evidence." Doc. No. 80-1, at 25. Caldwell also asserts that there is neither evidence of Caldwell engaging in any retaliatory conduct nor of a causal connection. *Id*. at 26. Smart responds that "Caldwell steered Schmidheiser and McLaughlin to ruin Plaintiff's career. A jury could easily and reasonably find that a causal connection exists between Plaintiff's First Amendment activities and grave harm he suffered when the retaliation occur[r]ed." Doc. No. 92-2, at 18-19. I deny summary judgment without prejudice and will direct Caldwell and Smart to provide supplemental briefing via a separate order.

Caldwell does not define what constitutes a § 1983 First Amendment Retaliation claim; rather, he argues that Smart has not provided "any specific facts as to how Caldwell allegedly knew [about Smart's protected speech]." Doc. No. 80-1, at 25 (emphasis in original). Caldwell also argues that "there is no evidence that Caldwell engaged in alleged retaliatory conduct by (1) 'supporting' false allegations of theft against Smart or (2) suspending Smart once he was arrested on theft charges." *See id*. at 24-26. Smart argues summary judgment should be denied under the rule set forth by *Mitchell v. Horn. See* Doc. No. 92-2, at 18-19 (citing 318 F.3d 523 (3d Cir. 2003)). *Mitchell's* standard is for prisoner-plaintiffs arguing that they were deprived of their first amendment rights during incarceration. *Mitchell* is inapplicable here. Smart was a corrections officer, not a prisoner.

The Supreme Court has discussed what is required when a public employee alleges their employer has violated the employee's First Amendment rights. "[T]he First

Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (collating cases). A plaintiff must first establish that he was speaking as [a] citizen; if he cannot do so, then there is no cause of action. *Id*. If he can, then "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee different from any other member of the general public." *Id*. While the Court intended to preserve First Amendment rights to the citizen who is a public employee, "it does not empower them to 'constitutionalize the employee grievance.'" *Id*. (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

The Third Circuit, in *Falco v. Zimmer*, discussed a general rule that a public employee's speech is protected under the First Amendment when 1) the employee was speaking in the capacity of a citizen, not as an employee, 2) concerning a matter of public concern, and 3) the government employer was unable to provide "an adequate justification" for differential treatment between the employee and a non-employee citizen. 767 F. App'x 288, 300 (3d Cir. 2019) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)).

I deny summary judgment without prejudice. In a separate order, I direct the relevant parties to provide supplemental briefing using the proper legal standards.

### C.  I Grant Summary Judgment in Favor of the FOP Defendants on Count VIII: Breach of Contract.

The FOP Defendants submit that Count VIII should be dismissed via summary judgment. The FOP Defendants submit that they did not violate the terms of their contracts to provide legal counsel because Smart's prosecution was not covered under the terms of the agreements. Doc. No. 89-3, at 11-12. Smart responds with two

arguments. Smart argues a genuine issue of material fact exists, because Smart "was shut out from receiving legal services" and this "shut out" violated the "duty of good faith and fair dealing" inherent in all contracts. Doc. No. 95-1, at 3. Alternatively, Plaintiff argues that the claim is "estopped by [Defendant's] own actions from arguing that Plaintiff is not entitled to reimbursement of attorney's fees." Doc. No. 95-1, at 5.

To show a breach of contract, Smart must demonstrate that there was a valid contract, defendants failed to perform under the contract, and damages resulted. *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 131 (D.N.J. 2012) (citing *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. App. Div. 2007)). There is no dispute between the parties that there was a valid contract. The dispute regards whether the State FOP or Local 97 failed to provide counsel in violation of the by-laws of either union, thus requiring defendants to pay the attorney's fees incurred by Smart as a remedy for the breach. The FOP Defendants argue that, as a matter of law, Smart's prosecution was not a covered litigation for which either the State FOP or Local 97 was obligated to represent Smart per the legal defense agreement and that the defendants did not breach a duty required under the contract. Doc. No. 89-3, at 11-12.

The plain language of the legal defense agreement provides that counsel will not represent a union member if the incident is not "duty-related." *See* Defense Agreement. The State FOP also affirms this in their by-laws: "The New Jersey State Lodge and any local lodge within its scope, shall not be obligated to furnish legal defense to any member or members, for an offense outside his or her police duties. . .." State FOP By-Laws, at 31-33. Local 97's by-laws contain similar language: "[a]ny active member in good standing who shall as a result of the proper performance of his law enforcement duties be threatened with arrest or who is actually arrested or sued. . . shall be entitled

to apply to the lodge for legal assistance." Local 97 By-Laws, at 19-20. The language is clear. Smart has not provided any analysis explaining how the criminal prosecution for alleged misappropriation of union funds is the result of his "police duties" or "the proper performance of his law enforcement duties"; the facts do not lead to such an inference either. As a matter of law, no breach occurred as there was no duty to provide counsel for the prosecution under the plain language of the contracts. I need not address Smart's bad faith argument because there was no duty to provide representation.

> 1.   *Smart Has Not Met the Requirements for His Estoppel Argument and Smart's Argument Relies on Inadmissible Evidence.*

Plaintiff argues that the State FOP is "estopped by [Defendant's] own actions from arguing that Plaintiff is not entitled to reimbursement of attorney's fees." Doc. No. 95-1, at 5. Smart argues that when the State FOP voted to pay approximately $20,000 for Smart's fees, upon a motion by Capanna, the "actions show a factual issue as to whether Defendants' breached their obligation under the contracts to pay Plaintiff's defense fees." Doc. No. 95-1, at 6. The FOP Defendants respond that this would be inadmissible evidence, because the conversation and vote surrounding the $20,000 is akin to settlement negotiations that are explicitly barred as evidence under New Jersey Rule of Evidence 408. Doc. No. 95-1, at 6.

I address Smart's estoppel claim first, then the evidentiary argument. Smart argues that the State FOP's vote to pay $20,000 in attorney's fees is "an admission of Defendants' obligations to pay Plaintiff's attorney's fees"; that the debate whether to pay "is evidence of Defendants' contractual duty to pay the fees"; and this evidence shows "Defendant's obligation to pay Plaintiff's attorney's fees and that Defendants has previously breached their obligation to do so." Doc. No. 95-1, at 6. In sum, Smart

submits that the FOP Defendants are estopped from claiming no breach, because when the State FOP Board voted on paying the fees, the State FOP Board acknowledged their duty to pay.

The FOP Defendants reply that Smart is misrepresenting what the vote was for. The State FOP claims that this vote was not for a gift, but rather for a loan which Smart denied as he disagreed with the terms of that agreement. Doc. No. 98, at 7 (citing to Smart Dep. at 385:21-386:11).[51] Deciding whether the vote regarded a loan or a gift is immaterial. *See Anderson*, 477 U.S. at 249 (a material issue of fact occurs when the resolution of the fact may affect the outcome of the suit).

Smart does not make clear which theory of estoppel he is pursuing. *See* Doc. No. 95-1, at 5-6 (the only reference to estoppel is in Plaintiff's heading: "Defendants Are Estopped by Their Own Actions. . ."). After review of the various theories of estoppel available, equitable estoppel is the only theory which could apply.

New Jersey defines equitable estoppel as

the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse."

*Heuer v. Heuer*, 704 A.2d 913, 918 (N.J. 1998) (internal citations omitted). Equitable estoppel "can arise from any type of '*conduct* of a party, using [the word conduct] in its broadest meaning as including [a party's] spoken or written words, his positive acts, and

---

[51] In his deposition, Smart indicates that "the only thing the State offered me was a loan, and they said that they could allocate. . . somewhere around 20,000 dollars for a loan and whenever I received my back pay, I had to pay it back" but Smart rejected the offer, because he didn't like the terms. *Id*. at 385:21-386:16. Under the sham affidavit doctrine, Smart is not able to create a material issue of fact to defeat summary judgment when his sworn testimony contradicts his current averments. *See Baer*, 392 F.3d at 624 (citing *Hackman*, 932 F.2d at 241). I shall give the Plaintiff the benefit of the doubt here only because there is other deposition testimony in the record that neither affirms nor denies that the vote was for a loan or a gift. *See* Williamson Dep. 31:15-33:21.

his silence or negative omission to do anything.'" *Royal Associates*, 490 A.2d at 361 (emphasis original) (quoting *State v. U.S. Steel Corp.*, 126 A.2d 168 (N.J. 1956) (internal quotations omitted)). Equitable estoppel is "designed to assure that the loss is borne by the party who made an injury possible or could have prevented it." *Merck & Co. v. KGAA*, No. CV160266ESMAH, 2022 WL 19521725, at *7 (D.N.J. Sept. 30, 2022) (quoting *In re Hunt's Pier Assocs.*, 143 B.R. 36, 44 (Bankr. E.D. Pa. 1992)).

Equitable estoppel is an appropriate avenue "to preclude defendants' from raising certain defenses if they previously had made representations to the plaintiff which the plaintiff reasonably relied on to its detriment." *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. CIV. A. 07-321 (WHW), 2008 WL 2783339, at *3 (D.N.J. July 16, 2008) (citing *Bechte v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989) ("holding that defendant is equitably estopped from pleading statute of limitations as a defense"); *Highway Trailer Co. v. Donna Motor Lines, Inc.*, 26 N.J. 442, 449 (N.J. 1966) ("holding that defendant is estopped from raising defense of defect in presentation of claim when previous conduct had led plaintiff to believe that claim had been adequately presented"); *Selective Ins. Co v. Coach Leasing*, 2008 WL 2404183, at *9 (N.J. Super. App. Div. June 16, 2008) ("holding that defendant is precluded from asserting a defense on equitable estoppel grounds").

"The burden of proving equitable estoppel 'is on the party invoking the doctrine.'" *Capitalplus Equity, LLC*, Civil Action No. 07–321 (WHW), 2008 WL 2783339, at *3 (citing *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F.Supp.2d 523, 532 (D.N.J. 2000)). To appropriately show equitable estoppel, a plaintiff must establish there was "(i) a material misrepresentation, (ii) reasonable reliance upon the misrepresentation, and

(iii) damage resulting from the misrepresentation." *Id.* (quoting *Hein v. F.D.I.C.*, 88 F.3d 210, 221 (3d Cir. 1996) (internal citations omitted)).

Based off the record,[52] the facts are as follows. Smart initiated a breach of contract claim against Local 97 for not providing counsel during the criminal proceedings in New Jersey in 2016. *See* Doc. No. 1-1, at 3. In October 2018, Smart was acquitted of his criminal charges. Williamson Dep. 31:15-33:21. In December 2018, Capanna presented a motion to the State FOP's board of directors requesting Smart's criminal legal expenses be reimbursed. *Id.* After discussion, there was a vote to directly pay Smart's attorney a portion of the legal fees incurred. *Id.* There is no evidence indicating that Smart was present for this vote. There is no evidence indicating whether the amount was paid to the attorney. At some point, the State FOP offered Smart a $20,000 loan that was to be repaid from Smart's backpay. Smart Dep. at 385:21-386:11. Based on Smart's specific reference to his owed backpay, I infer that this conversation occurred after his acquittal of the criminal charges and communication from the County Sheriff's Office that Smart would be receiving backpay. *See* 10/17/18 Knestaut Letter to Smart, at 66-67. Based on the record, there is no indication that Smart relied upon the representation, such as it was, from the FOP Defendants and that damages resulted from the reliance. As a matter of law, Smart's estoppel argument fails.

I turn now to the FOP Defendants' evidentiary argument, that the evidence of the vote would be inadmissible because the vote was akin to settlement negotiation under New Jersey Rule of Evidence 408. New Jersey's Rule 408 indicates that "Rule 408

---

[52] Smart cites to his certification as proof that "Plaintiff certified that he understood that Mr. Capanna made a motion to the State FOP to pay his attorney's fees and that the FOP Defendants agreed to pay at least $20,000.00 of his fees, which was approximately one-third of his total fees." Doc. No. 95-1, at 6. However, the certification neither cites Plaintiff's owed legal fees nor does in discuss the State FOP vote. *See* Doc. No. 92-5, Exhibit B ("Smart's Certification").

generally follows Fed.R.Evid. 408". The Federal Rules of Evidence, Rule 408 is as follows:

> (a) Prohibited Uses. Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>> (2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
> (b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. I must first determine if these two offers are admissible evidence.[53]

For Rule 408 to govern a "dispute" must have begun. *See Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 527 (3d. Cir. 1995). To determine if the negotiation was made in furtherance of "compromising a claim", "[t]he existence of a disputed claim as well as the timing of the offer are relevant to making this determination." *Id.* (citing *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992)). Here, the FOP Defendants argue that Smart's Deposition and John Williamson's Deposition, the former vice president of the State FOP, indicate that the purpose of the vote for payment and the loans were akin to settlement negotiations. Doc. No. 98, at 8 (citing Smart Dep. and Williamson Dep.[54]).

Williamson's deposition explains the vote was to reimburse Smart's attorney directly for a portion of the fees. Williamson Dep. 31:15-33:21. Williamson indicates that

---

[53] I may rely only on admissible evidence when evaluating the parties' showings. *Blackburn*, 179 F.3d at 94-95.
[54] Williamson's Deposition was filed in full as FOP Exhibit H. Doc. No. 94-7.

this vote occurred in December of 2018. *Id.* Smart filed the first complaint in New Jersey in 2016. *See* Doc. No. 1-1, at 3. This complaint included a count of breach of contract against Local 97 for not providing counsel during the criminal proceedings. *Id.* Therefore, a dispute had been initiated approximately two-years prior to this vote. The vote was to pay for settlement of a dispute. Smart offers the vote to prove the validity of his claim and impeach the FOP's denial of his claim. FRE 408(a). Evidence of the vote and its circumstances is inadmissible under Rule 408, because such evidence concerns the "furnishing" of a valuable consideration in an attempt to compromise Smart's claim. FRE 408(a)(1). The vote also was conduct or a statement made during compromise negotiations about Smart's claim, and so inadmissible under FRE 408(a)(2).

Based on the above discussion, I grant the FOP Defendants' request for summary judgment on Count VII.

## CONCLUSION

For these reasons, I grant summary judgment on Counts I through VI, and on Count VIII. I deny summary judgment on Count VII without prejudice and direct Caldwell and Smart to provide supplemental briefings as directed by separate order. Therefore, the only remaining count in this claim is Count VII: Section 1983 First Amendment Retaliation against Defendant Caldwell.

**BY THE COURT:**

*s/Richard A. Lloret*
Honorable Richard A. Lloret
U.S. Magistrate Judge

Appendix A

| | County of Gloucester | Eugene Caldwell | William Glaze | Brad Schmidheiser | Michael McLaughlin | NJ FOP, State | NJ FOP, Local 97 |
|---|---|---|---|---|---|---|---|
| Count I: LAD Retaliation | Yes | Yes | Yes | Yes | Yes | Withdrawn by Plaintiff in MSJ response | Withdrawn by Plaintiff in MSJ response |
| Count II: LAD Racial Discrimination | Yes | Yes | Yes | Yes | Yes | No | No |
| Count III: § 1981 Race Discrimination | Yes | No | No | No | No | No | No |
| Count IV: § 1981 Retaliation and Race Discrimination | No | Yes: Retaliation & Race Discrimination | Yes: Race Discrimination Only | No | No | No | No |
| Count V: § 1981 Retaliation | | | | **Dismissed with Prejudice** | | | |
| Count VI: Malicious Prosecution | Yes | Yes | No | Yes | Yes | Withdrawn by Plaintiff in MSJ response | Withdrawn by Plaintiff in MSJ response |
| Count VII: § 1983 First Amendment Retaliation | No | Yes | No | No | No | No | No |
| Count VIII: Breach of Contract | No | No | No | No | No | Yes | Yes |